The STATE of Ohio, Appellee,

v.

NEELY, Appellant.

[Cite as *State v. Neely*, 161 Ohio App.3d 99, 2005-Ohio-2342.]

Court of Appeals of Ohio,
First District, Hamilton County.

No. C–030755.

Decided May 13, 2005.

100

Chris McEvilley, for appellant.

Joseph T. Deters, Hamilton County Prosecuting Attorney, and James M. Keeling, Assistant Prosecuting Attorney, for appellee.

---

MARK P. PAINTER, Judge.

{¶ 1} When suspects invoke their right to counsel, even if in custody, but later make statements while again in custody, does the original invocation continue forever, thus making later custodial statements inadmissible? This question has not, as far as we can tell, been answered in Ohio. We answer no. Even if a suspect, once in custody, invokes the right to counsel, if there is a break in custody for a reasonable time, then the prohibition on questioning expires and any later custodial statements are admissible. We affirm the trial court's judgment.

{¶ 2} Defendant-appellant, Michael Neely, appeals his conviction for aggravated murder. He alleges that the trial court erred by (1) denying his motion to suppress statements he made to police officers after invoking his *Miranda* rights, and (2) rejecting a jury instruction on reckless homicide. These challenges are meritless.

## I. A Rocky Relationship

{¶ 3} Sara Ridder was a 24–year–old single mother of three. William David Boyles was the father of her children and had been with Ridder for six years. Boyles was violent and abusive towards her during their relationship—he had even served a prison term for domestic violence against her.

{¶ 4} Approximately one month before Ridder's death, the relationship ended in another episode of domestic violence. Boyles had broken into her house, held a knife to her throat, and punched her. Ridder and Boyles had parted ways a few weeks before the attack. Ridder reported the attack and filed for a protective order. That request was granted, and Boyles was fitted with a Juris Monitor bracelet, which would set off an alarm and warn police if Boyles came within 1,000 feet of Ridder's home.

{¶ 5} Boyles faced a court date for this last attack. He was determined not to go back to prison. Boyles would often ask one of his friends to drive over to Ridder's apartment to see if she was there, as she had begun to avoid her apartment. Boyles would describe how he would like to go to her apartment and kill Ridder and the children. Boyles and his good friend, Neely, began to seek a gun with which they could commit the crime. During this period, Neely asked his cousin Michael Webster if he could get a gun for him. Boyles eventually purchased an SKS assault rifle. Neely told Webster that he was going to shoot Ridder for Boyles.

{¶ 6} Two nights before Ridder's death, Neely told Webster that he had been out all night looking for Ridder but could not find her. Neely had the rifle in the trunk of the car and the ammunition in the back seat. He could not find Ridder because she was hiding from Boyles. But with Boyles wearing the monitor, she felt it was safe to return to her apartment.

{¶ 7} On April 14, 2002, and into the early morning hours of April 15, 2002, Boyles was distressed because he was to appear in court for his indictment the following morning. Boyles asked Neely to drive over to Ridder's apartment to see if she was home. Neely, who had been drinking and was distraught over his friend's anguish, complied. He grabbed the assault rifle as he left Boyles's residence.

{¶ 8} Neely saw that a light was on in Ridder's apartment. He backed his car into the driveway and went to the rear door of the residence. Neely carried the rifle in the jumpsuit he was wearing. Ridder was standing behind the rear door, doing laundry. Neely could see her silhouette through the blinds; he fired a single shot ending Ridder's life. Ridder's children found her body the next day and called the police. Neely fled and disposed of the gun by breaking it into pieces and throwing it into the Ohio River.

## II.  The Aftermath of the Shooting

{¶ 9} Police investigators interviewed Boyles on the evening of April 15.  He denied any knowledge of the shooting.  The police eliminated Boyles as the shooter.  The following day, police stopped Boyles's vehicle as it was being driven by Neely and detained Neely for questioning.

{¶ 10} Although Neely was not formally pronounced under arrest, Detective Hilbert from the Cincinnati Police Homicide Unit advised him of his *Miranda* rights.  Neely signed a written waiver of those rights and agreed to speak with the officers.  But he did not say anything to incriminate himself.  Neely said that he knew that Boyles had talked about killing Ridder and that Boyles had an assault rifle.  Neely admitted that he had been with Boyles the night before, but said that he had left around 2:00 a.m.  But police later determined that Neely had not returned home until 6:30 a.m.

{¶ 11} Investigators scheduled a polygraph examination for Neely for the next day.  Neely agreed to the examination and returned home.  The next day, Hilbert went to pick up Neely for the polygraph test.  Neely said that he wanted to speak with an attorney before taking the test.  Hilbert left Neely's home without further questioning.

{¶ 12} On April 18, after speaking with attorney William Church from the Hamilton County Public Defender's office, Neely called Hilbert and refused to take the test.  Neely indicated that Church was his attorney and gave Hilbert Church's telephone number.  Hilbert called Church.  Church indicated that he did not represent Neely.  But he had advised Neely not to take the polygraph test.  Neely had no further contact with Church for eight months.

{¶ 13} In September, Neely was subpoenaed to testify before a grand jury concerning an investigation of Boyles.  Again, Neely was not in custody.  But the prosecutor read Neely his *Miranda* rights as a precautionary measure.  Neely then testified and did not incriminate himself.

{¶ 14} In December, Neely was scheduled to report to the probation department to have a monitoring device put on his ankle for an unrelated matter.  Afterwards, Neely agreed to go to the homicide unit next door to talk about some new information about the Ridder shooting.

{¶ 15} Boyles had been indicted for his part in Ridder's death.  And he had told police that Neely was the shooter.  The police wanted to verify some of Boyles's information with Neely.  Again, Neely was not in custody and was free to leave at any time.  But he was read his *Miranda* rights, and Neely again signed a waiver of those rights.  During the interview, Neely repeatedly maintained his innocence and said that he did not need a lawyer.  The only incriminating statement made by Neely was that he was the sole user of the

cellular phone used to call Boyles after the shooting. After the interview, Neely returned home.

{¶ 16} In January 2003, a Hamilton County grand jury indicted Neely for Ridder's murder. For the fourth time, Neely was advised of his *Miranda* rights and signed a waiver of those rights. He then confessed to firing a rifle at Ridder. But he claimed that he merely intended to scare Ridder, not to kill her.

### III. Aggravated Murder

{¶ 17} Neely was charged with one count of aggravated murder, accompanied by a gun specification. During pretrial hearings, Neely moved to suppress the statements that he had made to police and the prosecution. He contended that he had invoked his *Miranda* rights after his first statement and prior to his scheduled polygraph. He argued that the police were not permitted to interview him in December and January.

{¶ 18} At the suppression hearing, Neely argued that once he had invoked his right to counsel, it had to be honored unless he later initiated a contact with law-enforcement officers. Neely further argued that he was taking medication for psychological problems and that the police were aware of that fact. The trial court overruled the motion.

{¶ 19} Neely then moved for reconsideration of the trial court's ruling because a review of the documents provided by the state had revealed that when Neely appeared before the grand jury, he had made a second request for an attorney. The motion was heard immediately before jury selection and overruled.

{¶ 20} After the presentation of all the evidence at trial, Neely proposed additional jury instructions for murder and reckless homicide. The trial court granted Neely's request for an instruction on murder. But the court rejected the reckless-homicide instruction.

{¶ 21} The jury found Neely guilty of aggravated murder with a firearm specification. Neely was sentenced to life in prison with parole eligibility after 20 years, which was to be served consecutively to a three-year term for the firearm specification.

{¶ 22} Neely now presents two assignments of error. He asserts that the trial court erred by (1) failing to grant the motion to suppress his statements made to the police after he had invoked his *Miranda* rights and (2) refusing his request for a jury instruction on reckless homicide.

### IV. Invoking Miranda

{¶ 23} In his first assignment, Neely argues that the trial court erred by denying his motion to suppress statements he made after invoking his *Miranda* rights.

{¶ 24} When considering a ruling on a motion to suppress, we must accept the trial court's findings of fact if they are supported by competent, credible evidence.[1] But we must then independently determine, without deference to the trial court, whether the facts satisfy the applicable legal standard.[2]

{¶ 25} In determining whether a pretrial statement is involuntary, a court "should consider the totality of the circumstances."[3] And "[u]nder *Miranda v. Arizona*, the state may not use incriminating statements made during a custodial interrogation unless it proves that procedural safeguards resulted in the defendant's voluntary waiver of his constitutional privilege against self-incrimination. * * * Where a defendant is entitled to these procedural safeguards, or *Miranda* warnings, and the state has failed to inform the defendant of his rights, any incriminating statements made during a custodial interrogation must be suppressed at trial."[4] The privilege against self-incrimination "is fulfilled only when the person is guaranteed the right 'to remain silent unless he chooses to speak in the unfettered exercise of his own will.'"[5]

{¶ 26} To trigger the need to provide *Miranda* rights, an individual must be subjected to a custodial interrogation.[6] Whether a custodial interrogation has occurred depends on how a reasonable person in the suspect's position would have understood the situation.[7] "[T]he ultimate inquiry is simply whether there is a 'formal arrest or restraint on freedom of movement' of the degree associated with a formal arrest."[8] Determining what constitutes custody for *Miranda* purposes depends on the facts of each case.[9]

---

1. See *State v. Burnside*, 100 Ohio St.3d 152, 2003-Ohio-5372, 797 N.E.2d 71, at ¶ 8.

2. Id.

3. *State v. Lynch*, 98 Ohio St.3d 514, 2003-Ohio-2284, 787 N.E.2d 1185, at ¶ 54, quoting *State v. Edwards* (1976), 49 Ohio St.2d 31, 3 O.O.3d 18, 358 N.E.2d 1051, paragraph two of the syllabus.

4. (Footnote omitted.) *State v. Evans* (2001), 144 Ohio App.3d 539, 551, 760 N.E.2d 909.

5. *Miranda v. Arizona* (1966), 384 U.S. 436, 460, 86 S.Ct. 1602, 16 L.Ed.2d 694, quoting *Malloy v. Hogan* (1964), 378 U.S. 1, 8, 84 S.Ct. 1489, 12 L.Ed.2d 653.

6. See *State v. Lynch*, supra, at ¶ 47, citing *Oregon v. Mathiason* (1977), 429 U.S. 492, 494, 97 S.Ct. 711, 50 L.Ed.2d 714.

7. Id., citing *Berkemer v. McCarty* (1984), 468 U.S. 420, 442, 104 S.Ct. 3138, 82 L.Ed.2d 317.

8. *California v. Beheler* (1983), 463 U.S. 1121, 1125, 103 S.Ct. 3517, 77 L.Ed.2d 1275, quoting *Oregon v. Mathiason*, supra, 492 U.S. at 495, 97 S.Ct. 711, 50 L.Ed.2d 714.

9. Id.

{¶ 27} Hilbert first spoke with Neely the day after the murder. Neely was not in custody. But Hilbert advised Neely of his *Miranda* rights as a precaution, and Neely signed a written waiver of those rights. Neely was free to go—and he returned home. Neely concedes that suppression was not warranted for statements he made that day.

{¶ 28} The next day, Neely indicated that he wanted to consult an attorney before he took a polygraph test. Neely was not in custody and left without further questioning.

■ {¶ 29} Neely bases his argument on *Edwards v. Arizona*,[10] which held that once a suspect requests an attorney, police cannot initiate further interrogation until the suspect has consulted with counsel (the *Edwards* rule). Neely claims that this request for counsel in April invalidated any confession made after that time.

{¶ 30} After the April request, Neely's next contact with law enforcement was in September, when he appeared before a grand jury. Again, Neely was not in custody, but in an abundance of caution, the prosecutor read Neely his *Miranda* rights. Neely said he would like to speak to an attorney "[b]ecause David Boyles is a friend of mine and there is nothing really I can tell you guys or anything you already don't know." The prosecutor then asked whether Neely was invoking his right against self-incrimination or whether he was refusing to testify to protect a friend.

{¶ 31} The prosecutor again cautioned Neely that if he felt that the questioning might lead to something that would incriminate him, he had the right to remain silent and to consult an attorney. Neely then testified. He did not incriminate himself—and none of his testimony before the grand jury was used against him at trial. And we express no opinion on whether it could have been. Afterwards, Neely went home.

■ {¶ 32} Neely suggests that this testimony and his subsequent *Miranda* waivers were the result of improper coercion and inducement. But "the use of deceit is merely '* * * a factor bearing on voluntariness.'"[11] And the record does not indicate that the police attempted to wear down and confuse Neely in order to obtain a waiver of his rights. There was a significant time lapse between each *Miranda* warning.

---

10. See *Edwards v. Arizona* (1981), 451 U.S. 477, 101 S.Ct. 1880, 68 L.Ed.2d 378.

11. *State v. Cooey* (1989), 46 Ohio St.3d 20, 27, 544 N.E.2d 895, quoting *Schmidt v. Hewitt* (C.A.3, 1978), 573 F.2d 794, 801.

{¶ 33} In December, Detective Hilbert spoke with Neely again. Hilbert learned that Neely was scheduled to report to a probation office in the building next door on an unrelated matter. Neely agreed to speak with Hilbert. Neely was not in custody and was free to leave at any time. Again Hilbert gave Neely his *Miranda* rights, and Neely again signed a written waiver of those rights.

{¶ 34} During this interview, Neely insisted that he was innocent and that he did not need a lawyer. The only incriminating statement he made was that he was the sole user of the cellular phone used to call Boyles after the murder. After the interview, Neely went home. There is no contention that Neely was in custody on this or either of the prior two occasions when he was questioned.

{¶ 35} Almost a month later, Neely was indicted for the murder and was arrested. Neely was again advised of his *Miranda* rights—this time the advice was necessary. Neely signed a written waiver of those rights. He then gave the statement that was used against him in court and was the subject of his motion to suppress—that he fired the shot, but only meant to scare Ridder.

{¶ 36} Even if we were to accept Neely's claim that the first encounter with Detective Hilbert amounted to custody (which we do not), we agree with the opinion in *Kyger v. Carlton* [12] that the *Edwards* rule does not apply to suspects who are not in continuous custody. And even if we accept that Neely's appearance before the grand jury was custodial questioning (a much closer question), the result is the same. Even if both these episodes had been custodial interrogations, the break in custody negated the prohibition against further contact mandated by *Edwards*. Although this issue has received little attention in Ohio, we note that other courts have unanimously reached the same conclusion. [13]

{¶ 37} We find instructive the holding in *United States v. Bautista:* "*Edwards* is premised on the inherently coercive nature of custodial interrogation and is designed to prevent the authorities from badgering a suspect in custody after the suspect has invoked his *Miranda* right to have an attorney present during questioning. * * * Therefore, * * * in order for *Edwards* to apply, the suspect must be in custody from the time he invokes his right to the time when the subsequent interrogation is initiated. * * * If custody is broken, especially

---

12. *Kyger v. Carlton* (C.A.6, 1998), 146 F.3d 374.

13. See, e.g., *United States v. Barlow* (C.A.5, 1994), 41 F.3d 935, 946; *Dunkins v. Thigpen* (C.A.11, 1988), 854 F.2d 394, 397; *McFadden v. Garraghty* (C.A.4, 1987), 820 F.2d 654, 661; *United States v. Bautista* (C.A.10, 1998), 145 F.3d 1140, 1150; *United States v. Skinner* (C.A.9, 1982), 667 F.2d 1306, 1309; *People v. Storm* (2002), 28 Cal.4th 1007, 1023-1024, 124 Cal.Rptr.2d 110, 52 P.3d 52; *Maine v. Alley* (2004), 2004 Me. 10, 841 A.2d 803; *State v. Farris* (Mo.App.2004), 125 S.W.3d 365, 371–372; *Virginia v. Gregory* (2002), 263 Va. 134, 149, 557 S.E.2d 715.

for a lengthy period of time, the inherently coercive nature of custody itself is diminished and there is little to no risk of badgering by the authorities."[14]

{¶ 38} Because Neely was not in continuous custody from the time he first asserted his right to counsel, that assertion did not invalidate the later confession. Under the totality of the circumstances, a break in custody of 12 days was held sufficient by the Virginia Supreme Court—here the break was *five months*.[15] And the record does not demonstrate that Neely's confession was coerced or made involuntarily. In fact, on cross-examination, Neely conceded that he had waived his *Miranda* rights.

{¶ 39} Therefore, we overrule Neely's first assignment of error.

### V. Jury Instruction

{¶ 40} Neely's second assignment of error asserts that the trial court erred by not giving the jury a requested instruction on reckless homicide. The record indicates that Neely's attorney did request a jury instruction on reckless homicide. The court declined this request. And no objections were raised when the jury instructions were presented to the jury.

{¶ 41} Crim.R. 30(A) reads in part, "On appeal, a party may not assign as error the giving or the failure to give any instructions unless the party objects before the jury retires to consider its verdict, stating specifically the matter objected to and the grounds of the objection."[16] Therefore, "[a]bsent plain error, the failure to object to improprieties in jury instructions, as required by Crim.R. 30, is a waiver of the issue on appeal."[17]

{¶ 42} The record shows that Neely's counsel did not object after the trial court denied the request for the reckless-homicide instruction. Finding no plain error, we conclude that the issue has been waived. But even had Neely's counsel properly objected, we would reach the same conclusion.

{¶ 43} The state charged Neely with aggravated murder, which occurs when a person purposely, and with prior calculation and design, causes the death of another.[18] Before the trial court instructed the jury, Neely's counsel requested additional jury instructions on murder and reckless homicide. "Murder" is

---

14. *United States v. Bautista,* supra.

15. See *Virginia v. Gregory,* supra.

16. Crim.R. 30(A).

17. *State v. Underwood* (1983), 3 Ohio St.3d 12, 13, 3 OBR 360, 444 N.E.2d 1332.

18. R.C. 2903.01(A).

purposely causing the death of another.[19] "Reckless homicide" is recklessly causing the death of another.[20] The court allowed the additional instruction for murder but not the one for reckless homicide.

{¶ 44} A trial court is required to instruct the jury on a lesser included offense "only where the evidence presented at trial would reasonably support both an acquittal on the crime charged and a conviction upon the lesser included offense."[21] The trial court must view the evidence in the light most favorable to the defendant when deciding whether to instruct the jury on a lesser included offense.[22]

{¶ 45} Reckless homicide differs from murder only in respect to the culpable mental state—purposely versus recklessly. The state offered significant evidence that Neely purposely killed Ridder. Neely's cousin Webster testified that Neely pointed out Ridder to him and said that that was the woman he was going to "knock off." Neely then asked Webster for a gun. Webster saw Neely several days before the murder, and Neely said that he was driving around looking for Ridder, with an assault rifle and ammunition in his car. And when Webster saw Neely after Ridder's death, Neely told him that he had shot Ridder and that he "wasn't going to walk on eggshells for anyone."

{¶ 46} The only evidence to show that Neely had recklessly killed Ridder was Neely's own confession to the police, in which he stated that he had intended only to scare her. But we have previously held, "Even where the defendant offers some evidence through his own testimony supporting a lesser-included offense, he is still not entitled to an instruction on that offense if the totality of the evidence does not reasonably support an acquittal on the greater offense and a conviction on the lesser offense."[23]

{¶ 47} Perhaps most telling is that the jury was given the choice between aggravated murder and murder and chose to find Neely guilty of the greater offense of aggravated murder. We find it unlikely then that the jury would have found Neely guilty of the even less culpable crime of reckless homicide.

{¶ 48} We conclude that, based on the totality of the evidence, Neely was not entitled to an instruction on reckless homicide. Therefore, even had Neely

---

19. R.C. 2903.02(A).

20. R.C. 2903.041(A).

21. *State v. Thomas* (1988), 40 Ohio St.3d 213, 533 N.E.2d 286, paragraph two of the syllabus.

22. See *State v. Campbell* (1994), 69 Ohio St.3d 38, 47–48, 630 N.E.2d 339.

23. *State v. McCurdy*, 1st Dist. No. C–020808, 2003-Ohio-5518, 2003 WL 22358524, at ¶ 15.

properly objected to the trial court's denial of his request, his argument on appeal would have failed.

{¶ 49} Accordingly, we overrule Neely's second assignment of error and affirm the trial court's judgment.

Judgment affirmed.

HILDEBRANDT, P.J., and GORMAN, J., concur.