DECISION. *Page 2 
{¶ 1} Defendant-appellant Matthew Carovillano in two assignments of error challenges (1) the trial court's decision overruling his suppression motion, and (2) the sufficiency and weight of the evidence used to sustain the conviction against him for aggravated murder of a child under the age of 13. We affirm.
 I. Kay lee Schnurr's Short Life, and Carovillano'sCover-Up {¶ 2} Carovillano dated Marigrace Schnurr, and Schnurr had an 18-month-old daughter named Kaylee. Schnurr and Kaylee would often visit Carovillano's house, and he would visit theirs. As Schnurr and Carovillano continued their relationship, she eventually trusted him enough to occasionally leave Kaylee in his sole care.
 {¶ 3} On July 20, 2005, Schnurr and Kaylee went to Carovillano's home. Schnurr had originally planned to pick Carovillano up and return to Schnurr's mother's house, but when she arrived Carovillano had not showered. Carovillano suggested that the three go downstairs to watch television, and at some point Schnurr fell asleep. Carovillano took Kaylee upstairs to his bedroom to lay Kaylee down for a nap. Carovillano then went back downstairs to attempt to awaken Schnurr for sex. She was too tired and declined.
 {¶ 4} Carovillano then returned upstairs to shower. According to his initial narration, "I walked into my room to get [a] towel and noticed Kaylee wasn't on the bed. I turned the light on, and that's when I found her lying on the floor. [After] I *Page 3 
turned the light on, [I] was freaked out, [because] her eyes were not open all the way, and she was not breathing right. I [then] ran down the stairs to get Mari."
 {¶ 5} Marigrace testified that she was sleeping when Carovillano came downstairs and told her that Kaylee had fallen from the bed and was not moving. She also testified that Carovillano "was crying hysterically, [and] kept saying `I'm so sorry, I'm so sorry.'" Marigrace ran upstairs and found Kaylee on the floor. Carovillano later called 911.
 {¶ 6} The responding officer, Officer John Ferguson, walked in and saw Carovillano kneeling against an archway and crying. Ferguson testified that when he arrived at the scene Carovillano was crying uncontrollably and was very emotional.
 {¶ 7} The paramedics later arrived and took Kaylee to the Franciscan Mt. Airy Hospital and then to Cincinnati Children's Hospital for specialized treatment. Ferguson testified that when he responded he noticed marks and bruising on the outside of Kaylee's neck, and that this observation led him to believe that the injuries sustained by Kaylee were inconsistent with a fall from a bed.
 {¶ 8} The hospital also quickly determined, because of the degree of trauma, that falling from the bed was unlikely to have been the cause of Kaylee's injuries. Doctor Jeffery Spatz testified that he immediately noticed blunt trauma: "I saw multiple bruises, a very large bruise on the back of [Kaylee's] head that was bleeding, bruises on her jaw," her chest, and over the rest of her body. The doctor also stated that "the mechanism that was recorded, her falling off the bed, was not the appropriate mechanism of the injury. The injuries were too substantial to match up to what she had. Usually from falling off the bed, you won't see that much swelling in the posterior aspect of the head. The bruises underneath the neck don't occur *Page 4 
naturally. They only occur in abuse. The overall picture was not appropriate for someone that had just fallen off a bed. I determined shortly after arrival this was an abuse case, and made sure that the police were called in order to get the investigation started."
 {¶ 9} Later that day, Carovillano agreed to go to the police station for an interview, and after an hour and a half, Carovillano maintained that Kaylee's injuries were caused by her falling off the bed. Carovillano also agreed to submit to a computer-voice-stress-analyzer (CVSA) test.
 {¶ 10} On July 22, 2005, Ferguson went to Carovillano's home and drove him to the Springfield Township police department to take the CVSA test. Detective Patrick Kemper was to perform the CVSA test, and before the test was given, Kemper interviewed Carovillano. At the time, Kaylee was still struggling for her life, Carovillano's involvement in her injuries was questionable, and no arrest had been made. Carovillano was interviewed for over two hours before he finally confessed. The two hours leading to the confession were conversational and informal, and Carovillano was never threatened. In confessing, Carovillano gave the following account:
 {¶ 11} "Detective Kemper: What happened on that — I mean, did she * * *
 {¶ 12} "Carovillano: She just cried. And wouldn't stop. But I tried picking her up and holding her and rocking her and talking to her. I didn't even realize what I did. I just backhanded her over the head. And I just kept hitting her. And I left the room and just stopped and dropped to my knees. And I went back in, and she didn't do anything. She just laid there. I tried picking her up, she didn't move. I freaked *Page 5 
out." Carovillano also admitted that he had penetrated Kaylee with his finger, about one week before the police were called.
 {¶ 13} Kaylee would never regain consciousness; she died July 24, 2005.
 {¶ 14} A grand jury indicted Carovillano for rape[1] (Count I), aggravated murder after committing or attempting to commit rape[2]
(Count II), aggravated murder of a child under 13[3] (Count III), murder[4] (Count IV), and endangering children[5] (Count V) for the events alleged to have occurred on July 20. A three-judge panel found Carovillano guilty of Counts III, IV, and V, but he was acquitted of Counts I and II because the state was unable to show beyond a reasonable doubt that Carovillano had raped Kaylee on July 20, 2005. Carovillano was sentenced to life in the department of corrections without the possibility of parole.
 {¶ 15} In December 2005, Carovillano, in a separate case, was indicted for rape[6] in connection with his confession to having penetrating Kaylee with his finger about a week before July 20. He pleaded no contest, was found guilty by the court, and was sentenced to a consecutive life term in the department of corrections.
 II. The Suppression Motion {¶ 16} Carovillano assigns error to the trial court's decision denying his suppression motion. On appeal he argues that his confession should have been suppressed because (1) his Miranda waiver was involuntary, and (2) the confession was coerced. Neither argument has merit. *Page 6 
 {¶ 17} Under the Fifth Amendment of the United States Constitution, "[n]o person * * * shall be compelled in any criminal case to be a witness against himself." Courts have interpreted the Fifth Amendment to require that suspects in police custody be warned of certain rights before questioning.[7] But the Miranda warnings are required only when there is a custodial interrogation. In determining whether a custodial investigation had occurred in this case, the trial court had to consider "how a reasonable man in [Carovillano's] position would have understood his situation."[8] The focus of the inquiry should have centered on whether a formal arrest or restraint of freedom had occurred: "The ultimate inquiry is simply whether there is a formal arrest or restraint on freedom of movement of the degree associated with a formal arrest."[9]
 {¶ 18} When a suspect voluntarily appears for an interview, and when no arrest has been made, then no custodial interrogation has occurred that would require a recitation of Miranda rights.[10] In denying Carovillano's suppression motion, the trial court analogized the facts of this case to those in State v. Mason.[11]
 {¶ 19} In Mason, a detective stopped by the defendant's house and asked whether the defendant would go to the police station for a second time for another interview, and the defendant agreed. The defendant was transported in a police vehicle to the police station, where he was interviewed by police for approximately four hours. The defendant cooperated during the interview, and at its conclusion the defendant was arrested.[12] Until the arrest, the defendant was never told that he *Page 7 
could not leave, and he was never handcuffed, the door was not locked, and he was left alone in the room several times. The Mason court held that the defendant had not been in custody and therefore that the police did not violate his Miranda rights when they failed to read theMiranda warnings before his confession and arrest.[13]
 {¶ 20} In this case, Carovillano agreed to the interview the day before. He was transported to the police station in a police vehicle, but was not under arrest. Until he was arrested after the confession, he was never handcuffed, he was never told that he could not terminate the interview, and he was allowed to leave the interview room to take smoking breaks. While the interview-room door was locked for at least a portion of the interview, we are not persuaded that this converted an otherwise voluntary interview into a custodial interrogation. As we have noted, Carovillano was allowed to leave the room more than once to take a break and smoke. And throughout the interview, Carovillano questioned the interviewing officer about the likelihood of a future arrest, bolstering the conclusion that he had not been placed in custody. We are convinced that when Carovillano made his incriminating statements, no custodial investigation had occurred, and therefore that hisMiranda rights had not yet attached.
 {¶ 21} Even if we assume that the Carovillano interview was a custodial interrogation, he was apprised of his Miranda rights several times throughout the interview, and he read, signed, and initialed a form waiving his Miranda rights. A Miranda waiver must be voluntarily, knowingly, and intelligently made — that is, the totality of the circumstances must reveal an uncoerced choice made with a requisite *Page 8 
level of comprehension.[14] A signed waiver is presumptively valid — that is, it reflects that the waiver was voluntarily, knowingly, and intelligently made.[15] Carovillano acknowledged during the interview that he was 19 years old, was a high-school graduate, could read and write, and had experience with the criminal justice system. Our review of the record fails to reveal any justification for excluding Carovillano's statements under Miranda v. Arizona — Carovillano'sMiranda rights were not violated because they had not attached when he made the incriminating statements, and even if it is assumed that a custodial interrogation had occurred, Carovillano's waiver of hisMiranda rights was voluntarily, knowingly, and intelligently made.
 {¶ 22} But even where Miranda rights have not attached, the confession must nonetheless be given voluntarily under the totality of the circumstances. A confession is involuntary if the "defendant's will was overborne by the circumstances surrounding [the confession]."[16]
 {¶ 23} The Ohio Supreme Court has recited the boundaries of coercive conduct that may render a confession involuntary: "A confession is involuntary and violative of the United States and the Ohio Constitutions if it is the product of `coercive police activity.'[17]
`In deciding whether a defendant's confession is involuntarily induced, the court should consider the totality of the circumstances, including the age, mentality, and prior criminal experience of the accused; the *Page 9 
length, intensity, and frequency of interrogation; the existence of physical deprivation or mistreatment; and the existence of threat or inducement.'"[18]
 {¶ 24} The record reveals that Carovillano was alert, responsive, and composed during the interview. The two-hour interview was neither inordinately long nor confrontational — in fact, the transcript reflects a conversational tone. These factors weighed heavily against suppressing Carovillano's statements. But Carovillano also argues that police offers of leniency and false promises — that he could go home that day if he confessed — were coercive, and that his will was overborne by these circumstances.
 {¶ 25} As the trial court correctly noted, admonitions to tell the truth are uncoercive in nature — they are neither threats nor promises and are permitted.[19] And the use of deceitful tactics is not dispositive of the inquiry whether a statement was involuntarily induced or coerced; rather it is merely a factor bearing on voluntariness.[20]
Likewise, suggestions of leniency, promises that a defendant's cooperation will be considered in the disposition of charges,[21] and statements that a confession will be helpful[22] do not invalidate an otherwise legal confession.
 {¶ 26} Our review of the record convinces us that, under the totality of the circumstances, Detective Kemper's admonitions to tell the truth and suggestions of leniency did not constitute coercive police conduct. Though Kemper arguably insinuated, before the confession, that Carovillano would not be arrested that day, *Page 10 
that suggestion was justified under the facts. It is important to note that in this case, when Carovillano was interviewed, Kaylee was still alive, the police had no suspects or leads, and Carovillano was not under arrest. And if Carovillano had not confessed he would have been free to leave at the time.
 {¶ 27} Considering the interview in its entirety, we hold that the record reflects a confession free from the level of coercion necessary to convert what was a voluntary confession into an involuntary confession. Carovillano's will was not overborne by this conversational interview; rather, he showed some indicia of what appears to be a conscience and took responsibility for his actions. Carovillano's first assignment of error arguing that the trial court should have suppressed his confession is overruled.
 III. The Evidence {¶ 28} Carovillano's second and final assignment of error alleges that the evidence used to convict him was insufficient and that the conviction was against the manifest weight of the evidence. Essentially, Carovillano argues that the prosecution failed to prove that he had purposefully caused the death of Kaylee. Not so.
 {¶ 29} Evidence, whether it be circumstantial or direct, is sufficient to support a conviction if a reasonable trier of fact could have found that the essential elements of the crime had been proved beyond a reasonable doubt.[23] "The claim of insufficient evidence invokes an inquiry about due process. It raises a question of law, the resolution of which does not allow the court to weigh the evidence."[24] In the instant case, once the confession was properly admitted, a reasonable trier of fact *Page 11 
could have found beyond a reasonable doubt that Carovillano had purposefully caused the death of Kaylee. The conviction was sustained by sufficient evidence.
 {¶ 30} We now consider whether the judgment was against the manifest weight of the evidence. In reviewing a manifest-weight-of-the-evidence claim, the court must review the entire record and "weigh the evidence and all reasonable inferences, consider the credibility of witnesses and determine whether in resolving conflicts in the evidence, the jury clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered."[25] The discretionary power to grant a new trial should be exercised only in the exceptional case in which the evidence weighs heavily against conviction.[26] After reviewing the entire record, including the facts, the confession, and the inferences arising therefrom, we are convinced that the trier of fact neither lost its way nor created a manifest miscarriage of justice in finding that Carovillano had purposefully caused the death of Kaylee by repeatedly beating her. Carovillano's second assignment of error is overruled.
 {¶ 31} Having found no merit in either of Carovillano's assignments of error, we affirm the judgment of the trial court.
Judgment affirmed.
HILDEBRANDT and DINKELACKER, JJ., concur.
[1] R.C. 2907.02(A)(1)(b).
[2] R.C. 2903.01(B).
[3] R.C. 2903.01(C).
[4] R.C. 2903.02(B).
[5] R.C. 2919.229(B)(1).
[6] R.C. 2907.02(A)(1)(b).
[7] Miranda v. Arizona (1966), 384 U.S. 436, 479, 86 S.Ct. 1602.
[8] State v. Mason (1988), 82 Ohio St.3d 144, 154,694 N.E.2d 932.
[9] Id., citing California v. Beheler (1983), 463 U.S. 1121, 1125,103 S.Ct. 3517 (internal citations and quotations omitted).
[10] Id.
[11] Id.
[12] Id. at 153.
[13] Id. at 154.
[14] Moran v. Burbine (1986), 475 U.S. 412, 421, 106 S.Ct. 1135
(internal citations and quotations omitted).
[15] See State v. Bays (1999), 87 Ohio St.3d 15, 19, 716 N.E.2d 1126, citing United States v. Sammons (C.A.6, 1990), 918 F.2d 592, 597; see, also, State v. Lomax, 114 Ohio St.3d 350, 2007-Ohio-4277,872 N.E.2d 279, ¶ 10.
[16] See Dickerson v. United States (2000), 530 U.S. 428, 434,120 S.Ct. 2326; State v. Chase (1978), 55 Ohio St.2d 237,378 N.E.2d 1064.
[17] State v. Loza, 71 Ohio St.3d 61, 1994-Ohio-409, 641 N.E.2d 1082, quoting Colorado v. Connelly (1986), 479 U.S. 157, 167,107 S.Ct. 515.
[18] Id., quoting State v. Edwards (1976), 49 Ohio St.2d 31,358 N.E.2d 1051, paragraph two of the syllabus, vacated on other grounds (1978), 438 U.S. 911, 98 S.Ct. 3147.
[19] See State v. Loza (1994), 71 Ohio St.3d 61, 67, 641 N.E.2d 1082;State v. Masur, 1st Dist. No. C-030692, 2004-Ohio-3131, ¶ 8.
[20] See State v. Neely, 161 Ohio App.3d 99, 2005-Ohio-2342,829 N.E.2d 718, ¶ 32.
[21] See State v. Julious (2001), 1st Dist. Nos. C-010048, C-010049, and C-010050, citing State v. Wilson (1996),117 Ohio App.3d 290, 294, 690 N.E.2d 574; Loza, supra.
[22] See Edwards, supra, 49 Ohio St.2d at 40-41.
[23] See State v. Jenks (1991), 61 Ohio St.3d 259, 574 N.E.2d 492, paragraph two of the syllabus.
[24] State v. Martin (1983), 20 Ohio App.3d 172, 175, 485 N.E.2d 717
(internal citations omitted).
[25] See State v. Martin, supra, 20 Ohio App.3d at 175.
[26] See State v. Group, 98 Ohio St.3d 248, 2002-Ohio-7247,781 N.E.2d 980, quoting State v. Martin, supra. *Page 1