[Cite as *State v. Conner*, 2025-Ohio-861.]

IN THE COURT OF APPEALS OF OHIO
SECOND APPELLATE DISTRICT
MONTGOMERY COUNTY

| | | |
|---|---|---|
| STATE OF OHIO | : | |
| | : | |
| Appellee | : | C.A. No. 30044 |
| | : | |
| v. | : | Trial Court Case No. 2023 CR 01356 |
| | : | |
| JOSEPH E. CONNER SR. | : | (Criminal Appeal from Common Pleas |
| | : | Court) |
| Appellant | : | |
| | : | |

. . . . . . . . . . .

O P I N I O N

Rendered on March 14, 2025

. . . . . . . . . . .

ROBERT ALAN BRENNER, Attorney for Appellant

MATHIAS H. HECK, JR., by ANDREW T. FRENCH, Attorney for Appellee

. . . . . . . . . . . .

HUFFMAN, J.

{¶ 1} Defendant-Appellant Joseph E. Conner Sr. appeals from his convictions for sexual imposition and gross sexual imposition involving two minors. He contends that the trial court erred in overruling his motion to suppress certain statements that he made during a police interview, because he was subjected to a custodial interrogation without the benefit of *Miranda* warnings and his statements were involuntary. He also contends

that his convictions should be reversed because they were against the manifest weight of the evidence.

{¶ 2} Conner voluntarily appeared for a police interview and, at that time, had not been arrested for the allegations giving rise to the need for questioning. Because he was not taken into custody or otherwise deprived of his freedom in any significant way during questioning, we cannot say that a reasonable person in Conner's position would not have felt free to leave; therefore, *Miranda* warnings were not required. Likewise, we cannot say that his statements were involuntary, as there was insufficient evidence that his will was overborne or his capacity for self-determination was critically impaired due to coercive police conduct. Finally, because the jury had the opportunity to view the witnesses' testimony, we will not substitute our judgment for that of the jury on the issue of witness credibility unless it is patently apparent that the jury lost its way in arriving at its verdict, which is not the case here. Accordingly, we affirm the judgment of the trial court.

## I.    Background Facts and Procedural History

{¶ 3} In June 2023, Conner was indicted for count one - unlawful sexual conduct with a minor in violation of R.C. 2907.04(A), a felony of the third degree; counts two and three - sexual imposition (reckless) in violation of R.C. 2907.06(A)(1), misdemeanors of the third degree; and counts four and five - gross sexual imposition (under 13) in violation of R.C. 2907.05(A)(4), felonies of the third degree. The count of unlawful sexual conduct with a minor and the two counts of sexual imposition involved Conner's then 13-year-old female step-family member, N.L. The two counts of gross sexual imposition involved another female relative who was then six years old, L.L.   N.L. and L.L. are cousins.

{¶ 4} The charges against Conner arose after the parents of N.L. and L.L. reported to the police that their daughters had spent the night at Conner's residence with another relative and that, during certain visits between the summer of 2022 and early 2023, Conner had inappropriately touched the children. At the time of these incidents, Conner was around 55 years of age.

{¶ 5} Following the filing of the police reports, N.L. and L.L. underwent forensic interviews at the child advocacy center, where they were questioned regarding what had occurred during their visits at Conner's residence and reported that Conner had sexually touched them. After the forensic interview, the police contacted Conner to inform him that an investigation was underway regarding the allegations against him. They requested that he come to the police station for a voluntary interview, and Conner agreed.

{¶ 6} On April 4, 2023, Conner arrived at the police station with his adult son for the agreed-upon interview. Upon his arrival at the police station, he was patted down in the lobby and was escorted to the interview room through a locked door, leaving the lobby and proceeding upstairs without his son.

{¶ 7} When Conner arrived in the small windowless interview room, he was seated behind a table opposite the door. He was advised by the interviewing detective that he was not under arrest, that he was free to leave, and that the door, while closed to minimize noise, was unlocked. He never asked for an attorney, to leave the room, or to stop answering questions during the interview. He was not advised of his *Miranda* rights.

{¶ 8} Approximately ten to 15 minutes after the interview commenced, Conner was confronted with the allegations of sexual misconduct described by N.L. and L.L. For an

hour and 40 minutes, the detective made allegations, and Conner denied them. As the interview progressed, the detective indicated to Conner that he did not believe that Conner was being truthful, so Conner suggested that he was willing to take a lie detector test. The detective agreed to arrange for a truth verification exam per Conner's request.

{¶ 9} While the truth verification exam was being set up in a different room, the detective offered Conner a bottle of water, which he accepted. When the detective left the room to check on the status of the exam setup, he locked the door, advising Conner that he was doing so because they were in a secure area; Conner verbalized understanding. Minutes later, the detective returned to the room and advised Conner that the test was ready. Conner was then escorted with one detective in front of him and one behind him to a second interview room. At that time, Conner apparently did not believe that he was free to leave.

{¶ 10} The second interview room had a window and a small table with two chairs. Conner was seated in the chair furthest from the door, and the table was located between him and the door. Before administering the exam, a different detective explained to Conner how the exam worked and reviewed the exam agreement form. Conner agreed to proceed with the exam, which was then conducted by the second detective in a calm manner.

{¶ 11} Upon his completion of the exam, Conner was advised that there were concerns within the exam result, suggesting that he was being deceptive. He eventually cried, claimed that he had felt good lying next to N.L. but denied that he had intentionally touched her, but he claimed that his penis had touched her body through the sheet. He

also stated that he had not been sexually aroused by L.L. Conner was not arrested at that time for the reported incidents, but he was taken into custody for a separate existing traffic warrant and was required to post bond in order to be released. He notified his son that he was being arrested on the traffic issue but explained that he would be out quickly once he paid. He was transported to the county jail, booked, posted bond, and was released immediately.

{¶ 12} During the interview, both detectives were in plain clothes (not in uniform), never displayed their weapons, and did not threaten Conner or otherwise use any force. He was not prevented from leaving or barricaded in any room. He did not ask for an attorney or request to leave at any time. The interview lasted approximately four hours.

{¶ 13} After he was charged and pled not guilty, Conner moved to suppress the statements he made to the detectives during the interview, arguing that his statements had been obtained in violation of his rights under the United States and Ohio Constitutions, *Miranda v. Arizona*, 384 U.S. 436 (1966), and other laws. He asserted that he had not been advised of his *Miranda* rights verbally or in writing, despite the fact that he was subjected to a custodial interrogation and that his will was overborne, rendering any confession involuntary.

{¶ 14} The trial court overruled Conner's motion to suppress, pointing out that he had voluntarily gone to the police department with his son and had agreed to be interviewed. The court stated that, because he had been there voluntarily and had not been in custody, the detective was not required to provide him with *Miranda* warnings. The court further found that the interview had been conducted in a calm and orderly

manner and that the detectives' questioning had not been aggressive or forceful at any time. The court observed that the detectives never raised their voices, showed their weapons, or became physical with Conner. The court concluded that there was no evidence that Conner's will had been overborne by coercion, threats, or promises at any point during the interview and that, based on the totality of the circumstances, any statements made by him during the interview had been voluntarily obtained and therefore admissible.

{¶ 15} The matter proceeded to a jury trial, and several witnesses testified.

{¶ 16} N.L., who was 15 years old at the time of trial, testified that Conner had inappropriately touched her and himself in her presence. She explained that, when she was around 13 years old, she slept over at a female relative's house, and she would often sleep in the bed between the relative and Conner. She stated that, on different occasions, Conner sought to kiss her multiple times, touched her chest, licked her vagina, touched and rubbed his penis against her leg or hip when she was lying in the bed next to him, and placed her hand onto his "private part." She testified that, initially, she only told her brother about the incidents but that she no longer wanted to go to her relative's house because of Conner's actions.

{¶ 17} L.L., who was eight at the time of trial, testified that she also spent weekends at the female relative's house and slept in the same bed with the relative and Conner. According to L.L., when she was around six years old, Conner had grabbed her hand and placed it "on his private" and touched his "private part" to her knee while she was lying in the bed next to him. L.L. stated that she told her relative about the incidents but that the

relative did not believe L.L.

{¶ 18} Leonard L. ("Leonard"), L.L.'s father, testified that, on one particular day, L.L. expressed that she did not want to go over to her relative's house. When Leonard inquired as to why L.L. did not want to visit her relative, she told him about Conner's inappropriate conduct. Leonard then notified his brother, William L. (N.L.'s father) ("William"), about L.L.'s allegations.

{¶ 19} William testified that, after learning about what L.L. had told her father, he confronted N.L. about whether Conner had ever acted inappropriately in her presence. He stated that, after being confronted, N.L. cried and told him about the inappropriate touching with Conner.

{¶ 20} The female relative at whose house the alleged incidents had occurred testified that L.L. had told her about the incident when Conner placed L.L.'s hand on his penis, but she did not believe it at the time. She also recalled an incident in which Conner had masturbated while the children were in the bed.

{¶ 21} Detective Robert Bluma, who initially interviewed Conner, testified that Conner had made admissions to him during the interview. According to Bluma, Conner stated that he lacked a sexual relationship with his wife and opined that he was filling the void with the children.

{¶ 22} Finally, Conner testified. He denied rubbing his penis and performing oral sex on N.L. but admitted to masturbating in order to arouse his partner, the girls' female relative, while N.L. was in the bed. He maintained that any contact that the girls may have had with his penis was by accident. He admitted that Detective Bluma had told him at the

beginning of the interview that he was free to go at any time. He also stated that he was savvy in dealing with law enforcement, and he admitted that he had never told the detective that he was ready to leave the interview or that he no longer wanted to speak to anyone. He claimed that, during the interview, he had told the detective three or four times that he did not do what was alleged but he "gave" the officer "what he wanted" because he did not believe that the detective would stop asking him. He also testified that he had had prior run-ins with law enforcement and was familiar with *Miranda* warnings.

{¶ 23} The jury returned a verdict of not guilty on count one and guilty on counts two through five. The sexual imposition charged in counts two and three involved N.L.'s allegations that he touched his penis against her body and placed her hand around his penis.   Counts four and five involved L.L.'s allegations that he had grabbed her hand and placed it on his penis and touched his penis to her knee.

{¶ 24} On counts four and five, Conner was sentenced to 60 months in prison, to be served consecutively. On counts two and three, he was sentenced 60 days each, to run concurrently to the sentences for counts four and five.   His aggregate prison term was ten years. He appeals.

## II.    Assignments of Error

{¶ 25} Conner's first assignment of error states:

THE TRIAL COURT ERRED WHEN IT OVERRULED CONNER'S MOTION

TO SUPPRESS EVIDENCE.

{¶ 26} With respect to his motion to suppress, Conner asserts that the trial court erred in two ways. First, Conner contends that the court erred by not granting his motion

to suppress because he was subjected to a custodial interrogation without the benefit of *Miranda* warnings. He argues that, although he was not formally arrested until after the interrogation, a reasonable person in his position would have believed that he was in custody. He maintains that he was in police custody during the entire interrogation and, thus, without being properly advised pursuant to *Miranda*, his statements should have been suppressed. Second, he asserts that his statements were not voluntary because his will was overborne under the totality of the circumstances, so his statements should have been suppressed.

{¶ 27} According to Conner, the custodial interrogation and coercion by the police started when he was patted down in the lobby of the police station by an armed detective and continued when he was separated from his son (who went with him to the police station). He was then escorted through a locked door, leaving the lobby and walking upstairs to the interview room. The door to the small windowless interview room was closed, and he was seated behind a table away from the door. He was confronted with allegations of sexual misconduct within ten to 15 minutes of the start of the interview, which he denied. After approximately an hour and 40 minutes, he offered to take a lie detector test and was briefly locked in the interview room while the truth verification exam was set up in a different room. Shortly thereafter, he was escorted to the second interview room by two officers and believed, at that point, that he was not free to leave. In the second interview room, he was seated across the room with the officers in front of the door. Conner argues that, despite his repeated denials of the allegations against him while in the first interview room, the officers continued to ask him the same questions and

he eventually told them what they wanted to hear after approximately four hours of questioning, because they were not accepting his repeated denials.

{¶ 28} At a suppression hearing, the State must prove that the contested evidence is admissible by a preponderance of the evidence. *Athens v. Wolf*, 38 Ohio St.2d 237 (1974). When considering a motion to suppress, the trial court takes on the role of trier of fact and is in the best position to resolve factual questions and assess the credibility of witnesses. *State v. Turner*, 2015-Ohio-4612, ¶ 10 (2d Dist.). The weight of the evidence and the credibility of the witnesses at a suppression hearing are matters for determination by the trial court. *State v. Fanning*, 1 Ohio St.3d 19, 20 (1982).

{¶ 29} An appeal from a ruling on a motion to suppress presents a mixed question of fact and law. *State v. Ojezua*, 2016-Ohio-2659, ¶ 15 (2d Dist.). As a result, we must accept the trial court's findings of fact if they are supported by competent and credible evidence. *Id.* "Accepting these facts as true, the appellate court must then independently determine, without deference to the conclusion of the trial court, whether the facts satisfy the applicable legal standard." *Id.*, quoting *State v. Koon*, 2015-Ohio-1326, ¶ 13 (2d Dist.). The trial court's application of law to the findings of fact is subject to a de novo standard of review. *Id.*

{¶ 30} Under the Fifth Amendment to the United States Constitution, no person shall be compelled to be a witness against himself. To ensure that this right is protected, statements resulting from custodial interrogations are only admissible after showing that the procedural safeguards described in *Miranda,* 384 U.S. 436, have been followed. *State v. Thompson-Shabazz*, 2017-Ohio-7434, ¶ 12 (2d Dist.), citing *State v. Earnest*, 2015-

Ohio-3913, ¶ 21 (2d Dist.). Under *Miranda*, police officers generally must warn a suspect, prior to questioning, that he or she has a right to remain silent and a right to the presence of an attorney; officers must advise the suspect of his or her rights only where the person is both in custody and subject to interrogation. *Id*., citing *Maryland v. Shatzer*, 559 U.S. 98, 103-104 (2010), citing *Miranda*.

{¶ 31} *Miranda* warnings are required only when there is a custodial interrogation. " 'Interrogation' includes express questioning as well as 'any words or actions on the part of the police (other than those normally attendant to arrest and custody) that the police should know are reasonably likely to elicit an incriminating response from the suspect.' " *Thompson-Shabazz* at ¶ 17, citing *State v. Strozier*, 2007-Ohio-4575, ¶ 20 (2d Dist.), quoting *Rhode Island v. Innis*, 446 U.S. 291, 301 (1980). "Interrogation" must reflect "a measure of compulsion above and beyond that inherent in custody itself." *Id*., citing *Innis* at 300.

{¶ 32} Only "when an individual is taken into custody or otherwise deprived of his freedom" in any significant way during questioning are *Miranda* warnings required. *State v. Tobias*, 2000 WL 1299535, *4 (2d Dist. Sept. 15, 2000), quoting *Miranda* at 478. When a suspect voluntarily appears for an interview, and when no arrest has been made, however, no custodial interrogation has occurred that would require a recitation of *Miranda* rights. *State v. Carovillano*, 2007-Ohio-5459, ¶ 18 (1st Dist.), citing *State v. Mason*, 82 Ohio St.3d 144, 154 (1998). Moreover, whether the individual is the focus of an investigation is not determinative of whether he or she is in custody, and a noncustodial situation is not converted into a custodial situation simply because questioning takes

place in a police station. *State v. Hoaja*, 1999 WL 355359, *7 (2d Dist. June 4, 1999); *State v. Henry*, 2009-Ohio-434, ¶ 13 (12th Dist.).

{¶ 33} Nevertheless, a defendant need not be under arrest to be "in custody" for *Miranda* purposes. *State v. Farris*, 2006-Ohio-3255, ¶ 13. "Custody exists when a reasonable person in the defendant's position would not have felt free to leave." *Tobias* at *4, citing *United States v. Mendenhall*, 446 U.S. 544, 554 (1980). "[T]he focus is not whether leaving would be inadvisable, but whether 'by means of physical force or show of authority, his freedom of movement is restrained.' " *Id.*, quoting *Hoaja* at *1, citing *Mendenhall* at 553. In other words, in determining whether a custodial interrogation has occurred, the trial court must consider how a reasonable person in the defendant's position would have understood his situation. *Carovillano* at ¶ 17, citing *Mason*. Because being in custody is measured by an objective standard—namely whether a reasonable person in the defendant's position would not have felt free to leave—the subjective belief or understanding of the suspect is irrelevant. *State v. Hoffer*, 112 Ohio App.3d 521, 545 (2d Dist. 1996).

{¶ 34} In the instant matter, Conner first contends that his interview with the police was of a custodial nature, and therefore he should have been provided with his *Miranda* warnings. We disagree.

{¶ 35} Conner voluntarily went to the police station, through his own means of transportation with his son, and agreed to be interviewed. Initially, because he went to the station voluntarily and was not in custody, the detective was not required to provide him with *Miranda* warnings. In the first interview room, he was specifically advised by the

detective that he was not under arrest; that he was free to leave; and that the door, while closed to minimize noise, was unlocked. He never asked for an attorney, nor did he ask to leave the room or to stop answering questions during the interview. When the detective left the room to arrange for the truth verification exam, he locked the door but told Conner that he was only locking it because they were in a secure area. Conner, who had suggested that he would take a lie detector test, was offered opportunities to avoid taking the exam but stayed at the station and waited to take it. At the conclusion of the exam, the detective indicated to Conner that the exam suggested he had not been truthful with respect to his answers to the questions about the allegations against him. The detective then advised Conner that he was not being arrested for anything related to the interview at that time, but that the case would be presented to the Montgomery County Prosecutor's Office for a determination of whether charges would be brought against him. Although he was taken into custody at the conclusion of the interview on an outstanding traffic warrant, he called his son to let him know he was going to jail because of the traffic issue and that he would be out quickly once he paid. He engaged in easygoing conversation with his son and never mentioned the nature of the interview. While he was waiting to be transported to jail on the traffic warrant, he continued to engage in small talk with the detective and did not appear to be upset or under stress.

**{¶ 36}** Based on our review of the interview, the trial court reasonably concluded that Conner had not been taken into custody or otherwise deprived of his freedom in any significant way during questioning, thereby requiring *Miranda* warnings. Conner voluntarily appeared for the interview and, at that time, was not arrested for the allegations

that gave rise to the need for questioning. Under these circumstances, we cannot say that a reasonable person in Conner's position would not have felt free to leave, and Conner's alleged subjective belief was irrelevant.

{¶ 37} Conner next argues that his statements during the interview were not voluntary because his will was overborne under the totality of the circumstances and thus, his statements should have been suppressed. Again, we disagree.

{¶ 38} Even when *Miranda* warnings are not required, a defendant's statement may be involuntary and subject to exclusion. *Thompson-Shabazz,* 2017-Ohio-7434, at ¶ 13 (2d Dist.), citing *State v. Zan*, 2013-Ohio-1064, ¶ 18 (2d Dist.). "In deciding whether a defendant's confession is involuntarily induced, the court should consider the totality of the circumstances, including the age, mentality, and prior criminal experience of the accused; the length, intensity, and frequency of interrogation; the existence of physical deprivation or mistreatment; and the existence of threat or inducement." *Id.*, citing *State v. Edwards*, 49 Ohio St.2d 31 (1976), paragraph two of the syllabus, overruled on other grounds, 438 U.S. 911 (1978). A defendant's statement to police is voluntary absent evidence that his will was overborne and his capacity for self-determination was critically impaired due to coercive police conduct. *Colorado v. Spring*, 479 U.S. 564, 574 (1987); *State v. Otte*, 74 Ohio St.3d 555, 562 (1996).

{¶ 39} At the time of the interview, Conner was 55 years old. From the video of the interview, he did not appear to be impaired by drugs or alcohol or to have any mental disability. He had prior experience with law enforcement and understood his *Miranda* rights based on his previous police encounters. The intensity of the questioning was

minimal. Although the detectives asked Conner questions and pressed him on certain issues, they were never aggressive in speech, tone, or body language. At no time during Conner's interview did the detectives become aggressive or forceful, and they did not raise their voices, brandish their weapons, or physically restrain Conner. He was never physically deprived, mistreated, or threatened in any way during questioning, and it was Conner who raised the issue of taking a "lie detector" test. Thus, based on the totality of the circumstances, we cannot say Conner's will was overborne and his capacity for self-determination was critically impaired due to coercive police conduct or that his statements were involuntarily induced.

**{¶ 40}** Conner's first assignment of error is overruled.

**{¶ 41}** Conner's second assignment of error states:

CONNER'S CONVICTIONS SHOULD BE REVERSED BECAUSE THEY

ARE AGAINST THE MANIFEST WEIGHT OF THE EVIDENCE.

**{¶ 42}** Conner next contends that his convictions were against the manifest weight of the evidence. He cites his testimony that he was not guilty of the allegations against him, that N.L. and L.L. had lied during their trial testimony, and that he had never had purposeful sexual contact with them. He claimed, among other things, that he had played with L.L. but that he never purposely placed her or N.L.'s hand on his penis and, thus, the jury lost its way and created a manifest miscarriage of justice. We disagree.

**{¶ 43}** A weight of the evidence argument challenges the believability of the evidence and asks which of the competing inferences suggested by the evidence is more believable or persuasive. *State v. Wilson*, 2009-Ohio-525, ¶ 12 (2d Dist.), citing *State v.*

*Hufnagel*, 1996 WL 501470 (2d Dist. Sept. 6, 1996). "[W]hen reviewing an argument challenging the weight of the evidence, an appellate court reviews the entire record, weighs the evidence and all reasonable inferences, considers the credibility of witnesses, and determines whether, in resolving conflicts in the evidence, the finder of fact clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered." *State v. Sheeders*, 2019-Ohio-3120, ¶ 28 (2d Dist.), citing *State v. Thompkins,* 78 Ohio St.3d 380, 387 (1997), quoting *State v. Martin*, 20 Ohio App.3d 172, 175 (1st Dist. 1983).

{¶ 44} "The credibility of the witnesses and the weight to be given to their testimony are matters for the trier of facts primarily to resolve." *Wilson* at ¶ 15, citing *State v. DeHass*, 10 Ohio St.2d 230 (1967). In *State v. Lawson*, 1997 WL 476684, *4 (2d Dist. Aug. 22, 1997), we explained:

> Because the factfinder . . . has the opportunity to see and hear the witnesses, the cautious exercise of the discretionary power of a court of appeals to find that a judgment is against the manifest weight of the evidence requires that substantial deference be extended to the factfinder's determinations of credibility. The decision whether, and to what extent, to credit the testimony of particular witnesses is within the peculiar competence of the factfinder, who has seen and heard the witness.

Thus, we will not substitute our judgment for that of the trier of fact on the issue of witness credibility unless it is patently apparent that the trier of fact lost its way in arriving at its verdict. *See Wilson* at ¶ 17, citing *State v. Bradley,* 1997 WL 691510 (2d Dist. Oct. 24,

1997).

{¶ 45} With respect to his conduct with N.L., Conner was charged with sexual imposition under R.C. 2907.06(A)(1), which states:

(A) No person shall have sexual contact with another; cause another to have sexual contact with the offender; or cause two or more other persons to have sexual contact when any of the following applies:

(1) The offender knows that the sexual contact is offensive to the other person, or one of the other persons, or is reckless in that regard.

Regarding his conduct with L.L., Conner was charged with gross sexual imposition under R.C. 2907.05(A)(4), which states:

(A) No person shall have sexual contact with another; cause another to have sexual contact with the offender; or cause two or more other persons to have sexual contact when any of the following applies:

(4) The other person, or one of the other persons, is less than thirteen years of age, whether or not the offender knows the age of that person.

"Sexual contact" means "any touching of an erogenous zone of another, including without limitation the thigh, genitals, buttock, pubic region, or, if the person is a female, a breast, for the purpose of sexually arousing or gratifying either person." R.C. 2907.01(B).

{¶ 46} In the case before us, Conner denied any sexual contact with N.L. and L.L. and claimed that, if any inappropriate contact did occur, it was accidental. He specifically denied ever placing N.L.'s or L.L.'s hands on his penis and contended that they had lied when they said he did. At trial, however, N.L. testified that Conner had inappropriately

touched her and himself in her presence. She explained that, on different occasions, when she slept at Conner's house, Conner kissed her multiple times, touched her chest, licked her vagina, touched and rubbed his penis against her leg or hip when she was lying in the bed next to him, and placed her hand onto his "private part." L.L. testified that she also slept over on weekends at Conner's house and that, on one occasion, Conner had grabbed her hand and placed it "on his private" and touched his "private part" to her knee while she was lying in the bed. She stated that she told her relative (Conner's wife) about the incident, but she did not believe L.L. N.L.'s and L.L.'s fathers and Conner's wife later corroborated N.L. and L.L.'s trial testimony. Thus, while the witnesses presented differing accounts of what had happened, this case simply required the members of the jury to choose between two conflicting sets of testimony. "We will not disturb the choice made by the trier of the fac[t] between witnesses and conflicting testimony unless it is so incredible that it defies belief . . . ." *State v. Morgan*, 2002-Ohio-3567, ¶ 8 (2d Dist.).

{¶ 47} In finding Conner guilty on two counts of sexual imposition under R.C. 2907.06(A)(1) with respect to N.L., the jury found that he had had sexual contact with her or caused her to have sexual contact with him when he rubbed his penis against her leg (first count) and then placed her hand on his penis (second count). Likewise, in finding Conner guilty of two counts of gross sexual imposition under R.C. 2905(A)(4) with respect to L.L. (who was less than 13 years of age), the jury found that he had sexual contact with L.L. or caused her to have sexual contact him when he placed her hand on his penis (first count) and then touched his penis to her knee (second count). Based on N.L.'s and L.L.'s testimony, the jury could have reasonably found that Conner, a 55-year-old man, chose

to rub his penis against them and to place their hands on his penis for no other reason than for sexual gratification and that such touching was offensive to both N.L. and L.L., who reported the incidents to their parents.

{¶ 48} The totality of the facts and circumstances in this case indicated that Conner had offensive sexual contact with N.L. and L.L. for his sexual gratification. Although this court considers the credibility of witnesses in reviewing the record, we accord due deference to the trier of fact. The credibility and the weight to be given to the testimony of each witness were matters for the jury as the finder of fact to resolve, and we will not substitute our judgment for that of the jury on the issue of witness credibility. The jury had the opportunity to view the witnesses' testimony and judge their credibility; viewing the record as whole, we find that the jury reasonably found that N.L.'s and L.L.'s testimony was credible. The jury was free to weigh the evidence, apply the evidence to the elements of each offense, and make a rational and logical determination of guilt.

{¶ 49} The record does not support a conclusion that the jury lost its way in arriving at its verdict and created such a manifest miscarriage of justice that Conner's convictions must be reversed and a new trial ordered. After examining the entire record, weighing the evidence and all reasonable inferences, and considering the credibility of the witnesses, we cannot say that Conner's convictions for sexual imposition and gross sexual imposition were against the manifest weight of the evidence. Conner's second assignment of error is overruled.

### III.   Conclusion

{¶ 50} Having overruled Conner's two assignments of error, the judgment of the

trial court is affirmed.

. . . . . . . . . . . . .


TUCKER, J. and LEWIS, J., concur.