[Cite as *State v. Ojezua*, 2016-Ohio-2659.]

**IN THE COURT OF APPEALS OF OHIO**
**SECOND APPELLATE DISTRICT**
**MONTGOMERY COUNTY**

| | | |
|---|---|---|
| STATE OF OHIO | : | |
| | : | |
| *Plaintiff-Appellant* | : | Appellate Case No. 26787 |
| | : | |
| v. | : | Trial Court Case No. 2014-CR-2837 |
| | : | |
| VICTOR OJEZUA | : | (Criminal Appeal from |
| | : | Common Pleas Court) |
| *Defendant-Appellee* | : | |
| | : | |

. . . . . . . . . . .

O P I N I O N

Rendered on the 22nd day of April, 2016.

. . . . . . . . . . .

MATHIAS H. HECK, JR., by CHRISTINA E. MAHY, Atty. Reg. No. 0092671, Assistant Prosecuting Attorney, Montgomery County Prosecutor's Office, Appellate Division, Montgomery County Courts Building, 301 West Third Street, Dayton, Ohio 45422
        Attorney for Plaintiff-Appellant

DANIEL J. O'BRIEN, Atty. Reg. No. 0031461, 131 North Ludlow Street, Suite 1210, Dayton, Ohio 45402
        Attorney for Defendant-Appellee

. . . . . . . . . . . . .

WELBAUM, J.

{¶ 1} Plaintiff-appellant, the State of Ohio, appeals from the decision of the Montgomery County Court of Common Pleas sustaining defendant-appellee Victor Ojezua's motion to suppress cocaine found on his person during a pat-down search. Specifically, the State contends the trial court erred in finding that Ojezua did not consent to the search. The State also contends the trial court erred in concluding that the officer who performed the search did not have a reasonable, articulable suspicion that Ojezua was armed and dangerous. There is competent, credible evidence in the record supporting the trial court's finding that Ojezua did not consent to the search. However, because the totality of the circumstances indicate that the officer who performed the search had a reasonable, articulable suspicion that Ojezua was armed and dangerous, the trial court's decision sustaining the motion to suppress will be reversed and the matter will be remanded to the trial court for further proceedings consistent with this opinion.

### Facts and Course of Proceedings

{¶ 2} On October 6, 2014, Ojezua was indicted for one count of possessing cocaine in an amount equaling or exceeding 20 grams, but less than 27 grams, in violation of R.C. 2925.11(A). The charge arose after officers discovered cocaine on Ojezua's person during a July 8, 2014 traffic stop. Following the indictment, Ojezua's defense counsel filed a motion to suppress. As part of the motion, Ojezua argued that the evidence seized from his person was discovered through an unlawful search without his consent. A two-day hearing on the motion to suppress was then held on April 9 and 10, 2015.

{¶ 3} During the suppression hearing, the State presented testimony from Detective Sam Hemingway of the Montgomery County Regional Agencies Narcotics and Gun Enforcement Task Force (R.A.N.G.E.). Hemingway testified that on July 8, 2014, he was on duty investigating a suspect who resided at 305 Kenilworth Avenue in Dayton, Ohio. Hemingway, who was dressed in civilian clothes and traveling in an unmarked vehicle, was parked near that residence for surveillance purposes. According to Hemingway, Detectives Patrick Craun and Pat O'Connell were also involved with the investigation and were parked nearby in separate unmarked vehicles.

{¶ 4} Hemingway testified that during his surveillance of 305 Kenilworth Avenue, he observed a maroon Hummer pull up to the residence and stop. Hemingway then observed the suspect exit the residence and enter the rear passenger compartment of the Hummer. Hemingway testified that the suspect stayed inside the Hummer for approximately one to two minutes before returning to his residence. Hemingway then testified that he saw the Hummer drive away and that he followed it from a distance. Hemingway claimed that he did not know who was in the Hummer and did not witness the occupants make any furtive movements.

{¶ 5} Continuing, Hemingway testified that as he was following the Hummer, Detective Craun informed him via radio that he had observed the Hummer commit a traffic violation by failing to stop at a stop sign. Hemingway also testified that he personally observed the Hummer fail to correctly signal 100 feet before turning at a stop sign located at Viola and Burton Avenues. Hemingway testified that he then contacted marked cruisers in the area and informed them of the traffic violations so that a traffic stop could be conducted. Once the Hummer was stopped by the marked cruisers, Hemingway

returned to his post at 305 Kenilworth Avenue to continue his surveillance.

{¶ 6} Deputy Frederick Zollers of the Montgomery County Sheriff's Department testified that he was on duty assisting R.A.N.G.E. on the day in question. Zollers testified that Hemingway and the other detectives contacted him and requested that he stop a maroon Hummer for committing traffic violations that they had observed. Zollers located the Hummer and initiated the traffic stop, although he did not personally observe any traffic violations himself.

{¶ 7} Zollers testified that prior to pulling over the Hummer, he noticed the vehicle contained a front seat passenger, who was later identified as Ojezua. The driver of the vehicle was identified as Ojezua's brother. Zollers testified that he saw Ojezua make several furtive movements while he was following the Hummer. Specifically, Zollers testified that Ojezua was moving his head and shoulders from side to side and that he observed Ojezua's head and shoulders rise up as if he was lifting himself off the seat. Zollers testified that based on his training and experience, which included nine years on the police force and several hundred traffic stops, such movements were indicative of concealing, hiding, or destroying contraband.

{¶ 8} Zollers's partner, Deputy Brian Shiverdecker, was in a separate marked cruiser and he assisted the traffic stop after it was initiated by Zollers. Zollers testified that he advised Shiverdecker over the radio of the furtive movements he had previously observed for officer safety purposes. Zollers testified that after he stopped the Hummer in question, he made contact with the driver, identified himself, explained the reason for the stop, and obtained driver's licenses from both Ojezua and the driver. Zollers claimed that while he ran their identification information through the computer system in his

cruiser, Shiverdecker remained at the Hummer with Ojezua and the driver. Zollers testified that after running the information, he discovered several FI's (field investigation notes) indicating that both Ojezua and the driver had been previously involved in several narcotics and weapons offenses and that the driver was also on probation. Zollers testified that when he returned to the Hummer he asked the driver why he was on parole and the driver advised that he was on probation for felonious assault and possession. Zollers also testified that the driver consented to a search of the vehicle.

{¶ 9} According to Zollers, Shiverdecker heard the conversation regarding the driver's prior offenses. Oddly enough, when Shiverdecker testified he was not asked whether he heard this conversation or whether he was aware of the prior offenses. Throughout the traffic stop, Shiverdecker was located at the passenger side of the Hummer near Ojezua. Shiverdecker testified that after Zollers advised him that the driver had consented to a search of the vehicle, he asked Ojezua if he had any guns, knives, or illegal contraband on his person, to which Ojezua said he did not. Shiverdecker further testified that before asking Ojezua to step out of the vehicle, he asked him if he would consent to a search of his person. According to Shiverdecker, Ojezua verbally consented to a search. As a result of that consent, Shiverdecker testified that he performed a pat-down search on Ojezua.

{¶ 10} During the pat-down search, Shiverdecker claimed that he felt a large, lumpy rock-like object in the groin area of Ojezua's pants. Shiverdecker testified that as soon as he felt the object, he then smelled a strong odor of marijuana emanating from Ojezua's pants. Shiverdecker testified that based on his 11 years of experience as a police officer, it is common for individuals to hide contraband in their groin area. He also

testified that upon feeling the object in Ojezua's groin area, it was immediately apparent to him that it was some kind of contraband.

{¶ 11} After feeling the object, Shiverdecker claimed he asked Ojezua what the object was and that Ojezua responded by saying it was nothing and bowed his head. Thereafter, Shiverdecker handcuffed Ojezua and advised Zollers that Ojezua had something on him. Shiverdecker testified that he handcuffed Ojezua in case he attempted to flee or conceal or destroy evidence. Shiverdecker also testified that he freed one of Ojezua's hands so he could remove the object from his pants. When Ojezua took out the object from his pants, Shiverdecker testified that it appeared to be large rocks of crack cocaine. Ojezua also handed him a baggie of marijuana.

{¶ 12} A video recording of the traffic stop taken from Zollers's cruiser camera was admitted into evidence at the suppression hearing. There was no audio of Shiverdecker's alleged conversation with Ojezua on the video, as only Zollers was equipped with a microphone. Ojezua testified that Shiverdecker never requested consent to search his person and that he never consented to the pat-down search.

{¶ 13} After hearing all the testimony and reviewing the video evidence, the trial court sustained Ojezua's motion to suppress. In so holding, the trial court found the traffic stop was lawful, but determined that the State failed to demonstrate that Ojezua consented to the pat-down search. The trial court came to this conclusion because the video of the traffic stop showed that the encounter during which Shiverdecker allegedly obtained Ojezua's consent was very brief and lasted only a few seconds. In addition, the trial court found Shiverdecker lacked a reasonable, articulable suspicion that Ojezua was armed and dangerous to justify performing the pat-down search. The State now appeals

from this decision, raising the following single assignment of error for review.

THE TRIAL COURT ERRED IN GRANTING OJEZUA'S MOTION TO SUPPRESS.

{¶ 14} Under its sole assignment of error, the State contends that in ruling on the motion to suppress, the trial court erred in finding that Ojezua did not consent to the pat-down search and that Shiverdecker lacked a reasonable, articulable suspicion to justify performing the pat-down search. We disagree with the State on the consent issue, but sustain the assignment of error on the basis of a lawful pat-down search.

**Standard of Review**

{¶ 15} " 'Appellate review of a motion to suppress presents a mixed question of law and fact. When considering a motion to suppress, the trial court assumes the role of trier of fact and is therefore in the best position to resolve factual questions and evaluate the credibility of witnesses.' " *State v. Koon*, 2d Dist. Montgomery No. 26296, 2015-Ohio-1326, ¶ 13 quoting *State v. Burnside*, 100 Ohio St.3d 152, 2003-Ohio-5372, 797 N.E.2d 71, ¶ 8. " 'Consequently, an appellate court must accept the trial court's findings of fact if they are supported by competent, credible evidence. Accepting these facts as true, the appellate court must then independently determine, without deference to the conclusion of the trial court, whether the facts satisfy the applicable legal standard.' " *Id.* "The application of the law to the trial court's findings of fact is subject to a de novo standard of review." (Citations omitted.) *State v. Turner*, 2015-Ohio-4612, ___ N.E.3d ___, ¶ 10 (2d Dist.).

**Consent to Search**

{¶ 16} The first issue raised by the State is whether the trial court erred in finding that Ojezua did not consent to the pat-down search during the traffic stop in question.

{¶ 17} Consent is an exception to the warrant requirement that requires the State to "show by 'clear and positive' evidence that the consent was 'freely and voluntarily' given." (Citations omitted.) *State v. Posey*, 40 Ohio St.3d 420, 427, 534 N.E.2d 61 (1988). Specifically, " ' "the State has the burden of proving that the necessary consent was obtained and that it was freely and voluntarily given, a burden that is not satisfied by showing a mere submission to a claim of lawful authority." ' " (Emphasis omitted.) *State v. Hawkins*, 2d Dist. Montgomery No. 25712, 2013-Ohio-5458, ¶ 14, quoting *State v. Robinette*, 80 Ohio St.3d 234, 243, 685 N.E.2d 762 (1997), quoting *Florida v. Royer*, 460 U.S. 491, 497, 103 S.Ct. 1319, 75 L.Ed.2d 229 (1983).

{¶ 18} "A 'clear and positive' standard is not significantly different from the 'clear and convincing' standard of evidence, which is the amount of proof that will produce in the mind of the trier of fact a firm belief or conviction as to the allegations to be proved. It is an intermediate standard of proof, being more than a preponderance of the evidence and less than evidence beyond a reasonable doubt." (Citations omitted). *State v. Ingram*, 82 Ohio App.3d 341, 346, 612 N.E.2d 454 (2d Dist.1992). " '[T]he question whether a consent to a search was in fact 'voluntary' or was the product of duress or coercion, express or implied, is a question of fact to be determined from the totality of all the circumstances." *Schneckloth v. Bustamonte*, 412 U.S. 218, 227, 93 S.Ct. 2041, 36 L.Ed.2d 854 (1973).

{¶ 19} In this case, the trial court determined that the State failed its burden to

show that Ojezua consented to the pat-down search, as it found no clear and positive evidence of consent.[1] In so holding, the trial court relied on the fact that the period of time that Shiverdecker testified to having obtained Ojezua's consent was too brief. Therefore, the issue is not whether consent was obtained freely and voluntarily, but rather whether Ojezua's consent was obtained at all. Upon reviewing the testimony and the video of the traffic stop, we find that there is competent, credible evidence in the record supporting the trial court's finding that there was no clear and positive evidence of consent.

**{¶ 20}** We note that Shiverdecker testified that he obtained Ojezua's consent to search his person after Zollers advised him that the driver had consented to a search of the Hummer. Thereafter, Shiverdecker claimed he asked Ojezua if he had any guns, knives, or illegal narcotics on him and whether he would consent to a search of his person. According to Shiverdecker, Ojezua advised that he had no guns, knives, or illegal narcotics on him and consented to a search. Shiverdecker testified that upon receiving consent, he then asked Ojezua to step out of the vehicle and conducted a pat-down search. Zollers testified that he did not hear Shiverdecker's conversation with

---

[1] The trial court also erroneously stated in its decision that "the time which the consent took place is hardly sufficient to show the Defendant had an awareness of his right to refuse consent." *Decision, Entry, and Order Sustaining Defendant's Motion to Suppress* (July 27, 2015), Montgomery County Court of Common Pleas Case No. 2014 CR 02837, Docket No. 54, p. 4-5. This statement was made in error because the trial court ultimately concluded that the State failed to demonstrate that Ojezua consented to the pat-down search. Awareness or knowledge of the right to refuse consent is a factor that is considered when determining whether a defendant's consent was given voluntarily. *State v. Mabry*, 2d Dist. Montgomery No. 26242, 2015-Ohio-4513, ¶ 16. Because the trial court found that Ojezua did not consent to the search (not that he gave consent and that his consent was involuntary), the trial court's finding with respect to his knowledge of the right to refuse consent is misplaced.

Ojezua and Ojezua testified that Shiverdecker never asked if he could search him and that he never gave his consent to be searched.

{¶ 21} The video of the traffic stop shows that after Shiverdecker was informed by Zollers that the driver had consented to a search of the Hummer, Shiverdecker walked to the front passenger side of the vehicle where Ojezua was located and opened the passenger door. During the next five and a half seconds, Shiverdecker pushed his sunglass up off his eyes, made a brief gesture with his arm, and Ojezua exited the vehicle. Once Ojezua exited the vehicle, he turned around and Shiverdecker immediately began to pat him down. There was no audio of the alleged conversation between Shiverdecker and Ojezua. There was also only a five and a half second window of time for Shiverdecker to communicate with Ojezua in the manner he alleged, i.e. to ask Ojezua: (1) if he had any guns, knives, or illegal narcotics; (2) if he would consent to a search; and (3) to step out of the vehicle, and for Ojezua to respond. Therefore, the video evidence supports the trial court's finding with respect to the briefness of the encounter.

{¶ 22} The State argues that it is clear from the video that Shiverdecker discussed consent with Ojezua *before* Zollers advised him that the driver had consented to a search of the Hummer, not after. In support of this claim, the State relies on a portion of the video where Shiverdecker is shown standing next to the passenger door, possibly conversing with the occupants, for approximately five minutes while Zollers was checking their identification information in his cruiser. However, Shiverdecker did not testify that he obtained Ojezua's consent during that period of time. Instead, Shiverdecker's testimony indicated that he questioned Ojezua and obtained his consent during the short

period of time after Zollers advised him that the driver had consented to a search of the Hummer. Furthermore, the video shows that after Zollers returned from checking the occupants' identification information, he appeared to ask Shiverdecker about consent, saying "would he?" and Shiverdecker replied "I haven't asked."

{¶ 23} Regardless of the State's position, it was the exclusive province of the trial court as the trier of fact to resolve the conflict in the evidence concerning consent and to determine the credibility of the witnesses and the weight to be given to their testimony. " '[W]here the decision in a case turn[s] upon credibility of testimony, and where there exists competent and credible evidence supporting the findings and conclusions of the trial court, deference to such findings and conclusions must be given by the reviewing court.' " *State v. Frank*, 2d Dist. Montgomery No. 18977, 2002 WL 628273, *4 (Apr. 19, 2002), quoting *Myers v. Garson*, 66 Ohio St.3d 610, 614, 614 N.E.2d 742 (1993).

{¶ 24} Here, the trial court obviously resolved the factual conflicts regarding consent against the State. Because the testimony and video evidence supports the trial court's finding that the encounter was too brief for Shiverdecker to have obtained Ojezua's consent, we will not interfere with the trial court's finding on appeal. Furthermore, the trial court was free to credit Ojezua's testimony that he did not consent to a search of his person. Accordingly, The State's claim that the trial court erred in finding Ojezua did not consent to a search is overruled.

**Reasonable, Articulable Suspicion to Justify Pat-Down Search**

{¶ 25} Next, the State contends the trial court erred finding that Shiverdecker lacked a reasonable, articulable suspicion that Ojezua was armed and dangerous to

justify performing a pat-down search on him during the traffic stop.   We agree with the State's claim.

{¶ 26} "Authority to conduct a pat[-]down search for weapons does not automatically flow from a lawful stop[.]"   *State v. Stewart*, 2d Dist. Montgomery No. 19961, 2004-Ohio-1319, ¶ 16.   When a lawful stop is made, an officer may conduct a limited search for weapons if the officer reasonably believes the suspect may be armed and dangerous.   (Citations omitted.)   *State v. Evans*, 67 Ohio St.3d 405, 408, 618 N.E.2d 162 (1993).   Therefore, to justify a pat-down search, an officer must point to specific, articulable facts that create a "reasonable individualized suspicion that the suspect is armed and dangerous[.]"   *State v. Roberts*, 2d Dist. Montgomery No. 23219, 2010-Ohio-300, ¶ 18, citing *Terry v. Ohio*, 392 U.S. 1*, 27, 88 S.Ct.1868, 20 L.Ed.2d 889 (1968).   (Other citations omitted.)

{¶ 27} However, "[t]he officer need not be absolutely certain that the individual is armed; the issue is whether a reasonably prudent man in the circumstances would be warranted in the belief that his safety or that of others was in danger."   (Citations and footnote omitted.)   *Terry* at 27*.   The existence of reasonable suspicion is determined by evaluating the totality of the circumstances, considering those circumstances "through the eyes of the reasonable and prudent police officer on the scene who must react to events as they unfold."   *State v. Heard*, 2d Dist. Montgomery No. 19323, 2003-Ohio-1047, ¶ 14, quoting *State v. Andrews*, 57 Ohio St.3d 86, 87-88, 565 N.E.2d 1271 (1991).

{¶ 28} A furtive movement is a factor which may contribute to an officer's reasonable suspicion that a suspect is armed and dangerous, but will not warrant a

protective search by itself. *State v. Wilcox*, 177 Ohio App.3d 609, 2008-Ohio-3856, 895 N.E.2d 597, ¶ 19 (2d Dist.), citing *State v. Bobo*, 37 Ohio St.3d 177, 179, 524 N.E.2d 489 (1988). In *Bobo*, the Supreme Court of Ohio referenced "[a] mere furtive gesture"; specifically, popping up and ducking down from inside a car. The Court found that such a gesture may indicate an attempt to conceal a gun or drugs, but that it was only one of many factors used to establish reasonable suspicion. *Bobo* at 179.

{¶ 29} Likewise, " '[p]ast incidents of numerous law violations of a particular character definitely constitute a fact that officers may consider in the totality of circumstances they rely upon[.]' " *Bobo* at 179, quoting *United States v. White*, 655 F.2d 1302, 1304 (D.C.Cir.1981). *Accord State v. Allen*, 2d Dist. Montgomery No. 23738, 2010-Ohio-3336, ¶ 30. In addition, "Ohio courts have long recognized that persons who engage in illegal drug activities are often armed with a weapon. 'The right to frisk is virtually automatic when individuals are suspected of committing a crime, like drug trafficking, for which they are likely to be armed.' " *State v. Martin*, 2d Dist. Montgomery No. 20270, 2004-Ohio-2738, ¶ 17, quoting *Evans* at 413.

{¶ 30} The facts of this case raise issues relating to the "collective knowledge doctrine" or "fellow officer" rule where knowledge of law enforcement officers is imputed to others. Under this doctrine, "police officers may develop the reasonable suspicion necessary to effect a search or seizure based on information obtained and relayed by fellow officers." *United States v. Chambers*, 6th Cir. No. 14-2537, 2015 WL 4899590 (Aug. 18, 2015), fn. 4, *citing United States v. Lyons*, 687 F.3d 754, 766 (6th Cir.2012). *Accord State v. Jones*, 2d Dist. Montgomery No. 23926, 2011-Ohio-1984, ¶ 20 (the collective knowledge doctrine "permits police officers to rely on information provided to

them by other officers in helping to establish probable cause or reasonable suspicion"). " 'Reasonable suspicion may exist based upon the collective knowledge of the police when there is reliable communication between the officer supplying the information and the officer acting on that information.' " *State v. Freeman*, 9th Dist. Summit No. 27617, 2015-Ohio-2501, ¶ 16, quoting *State v. Mook*, 9th Dist. Wayne No. 97CA0069, 1998 WL 417461, *3 (July 15, 1998).

{¶ 31} Collective knowledge may be applied horizontally and vertically. *United States v. Chavez*, 534 F.3d 1338, 1345 (10th Cir.2008). The court in *Chavez* explained that horizontal application involves situations:

> where a number of individual law enforcement officers have pieces of the probable cause puzzle but no single officer possesses information sufficient for probable cause. * * * In such situations, the court must consider whether the officers have communicated the information they possess individually, thereby pooling their collective knowledge to meet the probable cause threshold. * * *

*Id.*

{¶ 32} The court also explained that the vertical collective knowledge category involves "situations where one officer *has* probable cause and instructs another officer to act, but does not communicate the corpus of the information known to the first officer that would justify the action." (Emphasis sic.) *Id.* The Supreme Court of Ohio applied the vertical form of this doctrine when it held that a police officer need not always have knowledge of the specific facts justifying a stop and may rely, therefore, on a police dispatch or flyer. *See Maumee v. Weisner*, 87 Ohio St.3d 295, 720 N.E.2d 507 (1999),

citing *United States v. Hensley*, 469 U.S. 221, 231, 105 S.Ct.675, 83 L.Ed.2d 604 (1985). The court found that "[w]here an officer making an investigative stop *relies solely on a dispatch*, the state must demonstrate at a suppression hearing that the facts precipitating the dispatch justified a reasonable suspicion of criminal activity." (Emphasis sic.) *Id.* at 298.

{¶ 33} Since Hemingway ordered Zollers to stop the vehicle, his observations at 305 Kenilworth Avenue can be vertically imputed to Zollers and in turn, Shiverdecker. However, Hemingway also had no reason to stop the Hummer other than for the traffic violations. Therefore, when Hemingway requested Zollers to initiate a traffic stop of the Hummer, we find all that can be imputed to Zollers is the fact that the Hummer committed traffic violations that were observed by R.A.N.G.E. detectives.

{¶ 34} Nevertheless, both Zollers and Shiverdecker testified that they were on duty assisting R.A.N.G.E. on the day in question. The record indicates that R.A.N.G.E. primarily investigates narcotics and gun violations within Montgomery County. Zollers further explained that in assisting R.A.N.G.E., their duties include acting as marked cars to assist with traffic stops that result in drug arrests and seizures. Because they were assisting R.A.N.G.E. in that capacity on the day in question, Zollers and Shiverdecker were at least aware that the Hummer was involved in a R.A.N.G.E. investigation that would invariably concern narcotics and weapons offenses.

{¶ 35} Moreover, the horizontal collective knowledge doctrine applies to the communications between Zollers and Shiverdecker as the record indicates Shiverdecker pooled their collective knowledge when deciding to pat down Ojezua. Specifically, Zollers directly communicated to Shiverdecker that he had observed Ojezua make, not

one, but several furtive movements in the Hummer when Zollers began following him in his marked police cruiser. Given the direct communication to Shiverdecker, Zollers's knowledge of the furtive movements can be imputed to Shiverdecker even though Shiverdecker did not personally observe them for himself.

{¶ 36} The record also indicates that Zollers and Shiverdecker were both aware that the driver of the Hummer was on probation for felonious assault and possession. Zollers testified that "Shiverdecker obviously heard the conversation on the passenger side[,]" during which Zollers asked the driver why he was on probation and the driver responded that he was on probation for felonious assault and drug possession. Trans. (Apr. 10, 2015), p. 83 and 85. While Shiverdecker himself did not testify as to whether he heard this conversation, the video evidence supports Zollers's testimony, as it shows Zollers's conversation with the driver occurring in Shiverdecker's presence while Shiverdecker was standing on the passenger side of the vehicle. Again, " '[p]ast incidents of numerous law violations of a particular character definitely constitute a fact that officers may consider in the totality of circumstances they rely upon[.]' " *Bobo*, 37 Ohio St.3d at 179, 524 N.E.2d 489, quoting *White*, 655 F.2d at 1304.

{¶ 37} Even if Shiverdecker had not heard the conversation regarding the driver's prior offenses, Zollers's knowledge of the driver's offenses and Ojezua's prior involvement in weapons and narcotics offenses can be horizontally imputed to Shiverdecker as collective knowledge. Multiple federal courts, including the Sixth Circuit, have allowed the knowledge of officers working closely together on a scene to be mutually imputed without requiring proof of an actual communication or requiring only some degree of communication. *See, e.g., Collins v. Nagle*, 892 F.2d 489, 495 (6th

Cir.1989) (holding that because the knowledge of the investigators working together on the scene and in communication with each other is mutually imputed, not every arresting officer was required to possess all the information that, when amassed, gave rise to probable cause); *United States v. Woods*, 544 F.2d 242, 260 (6th Cir.1976) ("we do mutually impute the knowledge of all the agents working together on the scene and in communication with each other"); *United States v. Edwards*, 885 F.2d 377, 383-383 (7th Cir.1989) (imputing knowledge of one arresting officer to another because officers "made the arrest together"); *United States v. Kapperman*, 764 F.2d 786, 791, fn. 5 (11th Cir.1985) (looking to collective knowledge of officers where there was "minimal" communication between officers); *United States v. Nafzger*, 974 F.2d 906, 911 (7th Cir.1992) ("[W]hen officers are in communication with each other while working together at a scene, their knowledge may be mutually imputed even when there is no express testimony that the specific or detailed information creating the justification for a stop was conveyed"); *United States v. Gillette*, 245 F.3d 1032, 1034 (8th Cir.2001) (finding the validity of a search may be based on the collective knowledge of all of the law enforcement officers involved in an investigation if some degree of communication exists between them); *United States v. Terry*, 400 F.3d 575, 581 (8th Cir.2005) ("Where officers work together on an investigation, we have used the so-called 'collective knowledge' theory to impute the knowledge of one officer to others. * * * We impute information if there has been 'some degree of communication' between the officers"); *but see United States v. Shareef,* 100 F.3d 1491, 1504 (10th Cir.1996) (holding that even in the absence of any evidence of communication among officers it may sometimes be appropriate to look at collective knowledge in determining whether officers behaved reasonably;

however, a presumption of communication between officers is rebutted when it is in fact known that no information was shared); *United States v. Matthews*, 615 F.2d 1279, 1284, fn. 5 (10th Cir.1980); *United States v. Goeltz*, 513 F.2d 193, 197 (10th Cir.1975).

{¶ 38} Of course, there are limits to this doctrine, which the United States Sixth Circuit Court of Appeals has outlined as follows:

> Despite its flexibility, the collective knowledge doctrine is not without its restrictions. The doctrine's primary boundary is, of course, the Fourth Amendment itself. As with any traditional investigative stop, a traffic stop based on collective knowledge must be supported by a proper basis and must remain reasonably related in its scope to the situation at hand. *See* [*U.S. v.*] *Davis,* 430 F.3d [345] at 354 [6th Cir. 2005]. Accordingly, if an investigating officer "lacked sufficient information to satisfy the reasonable suspicion requirement, and the [responding officer's] subsequent observations did not produce reasonable suspicion," then the stop violates the Fourth Amendment. *Feathers* [*v. Aey*], 319 F.3d [843] at 849 [6th Cir. 2003]. Likewise, if a responding officer exceeds the stop's scope because he was not provided with the facts necessary to stay within its proper bounds, then any evidence improperly obtained therefrom remains subject to the exclusionary rule, just as if the investigating officer committed the error. *See, e.g., United States v. Pineda–Buenaventura,* 622 F.3d 761, 776 n. 5 (7th Cir.2010) (finding that the exclusionary rule "remain[ed] in play" when supervisors failed to communicate the proper bounds of a search warrant to executing officers). The taint of a stop effected without

reasonable suspicion similarly cannot be cured by an after-the-fact relay of information. *See* [*U.S. v.*] *Blair,* 524 F.3d [740] at 751-52 [6th Cir. 2008]. Applying traditional Fourth Amendment restrictions equally to the collective knowledge doctrine ensures that communications among law enforcement remain an efficient conduit of permissible police activity, rather than a prophylactic against behavior that violates constitutional rights.

The Seventh Circuit has helpfully clarified the application of the collective knowledge doctrine by identifying three separate inquiries: (1) the officer taking the action must act in objective reliance on the information received; (2) the officer providing the information must have facts supporting the level of suspicion required; and (3) the stop must be no more intrusive than would have been permissible for the officer requesting it. *United States v. Williams,* 627 F.3d 247, 252–53 (7th Cir.2010) (citing *United States v. Nafzger,* 974 F.2d 906, 911 (7th Cir.1992)). We are persuaded by the simplicity of this approach.

Moreover, and from a purely functional standpoint, practical considerations naturally restrict the collective knowledge doctrine, because a responding officer is invariably in a better position when provided with the details helpful and necessary to perform his duties. The relay of sufficient information is critical to a responding officer who needs to, for example, report to the correct location, identify the correct suspect, respond appropriately to exigent circumstances, and protect his safety and the safety of others.

*Lyons*, 687 F.3d at 766-767.

{¶ 39} None of the limits of the doctrine apply here. It is clear that Zollers and Shiverdecker were working closely together at the scene of the traffic stop and were communicating with one another about the events as they transpired. It is also noteworthy that Zollers ordered Shiverdecker to get Ojezua out of the vehicle so that it could be searched. Accordingly, the information Zollers had regarding the driver and Ojezua's prior offenses can be mutually imputed to Shiverdecker.

{¶ 40} Based on the totality of the circumstances, we conclude that Shiverdecker had sufficient knowledge in which to form a reasonable, articulable suspicion that Ojezua was armed and dangerous. Shiverdecker's reasonable suspicion was based on the officers' collective knowledge of Ojezua's multiple furtive movements, the Hummer being of interest in a R.A.N.G.E. investigation, the driver's prior felonious assault and drug offenses, and Ojezua's prior involvement in weapons and drug related offenses. We find that these factors created a reasonable suspicion that warranted Shiverdecker's pat-down search of Ojezua. Accordingly, the pat-down search at issue was lawful and the contraband recovered from the search was not properly suppressed.

**Conclusion**

{¶ 41} There was competent, credible evidence in the record supporting the trial court's finding that Ojezua did not consent to the search of his person. However, the record indicates that Shiverdecker possessed a reasonable, articulable suspicion to conduct a pat-down search. Therefore, the State's sole assignment of error challenging the trial court's suppression decision is sustained. Having sustained the State's sole

assignment of error, the judgment of the trial court is reversed and the matter is remanded to the trial court for proceedings consistent with this opinion.

. . . . . . . . . . . . .

FAIN, J. and HALL, J., concur.

Copies mailed to:

Mathias H. Heck, Jr.
Christina E. Mahy
Daniel J. O'Brien
Hon. Richard Skelton