[Cite as *State v. Cantu*, 2024-Ohio-3211.]

IN THE COURT OF APPEALS OF OHIO
SECOND APPELLATE DISTRICT
DARKE COUNTY

| | | |
|---|---|---|
| STATE OF OHIO | : | |
| | : | |
| Appellant | : | C.A. No. 2023-CA-32 |
| | : | |
| v. | : | Trial Court Case No. 23CR00077 |
| | : | |
| GABRIELLA R. CANTU | : | (Criminal Appeal from Common Pleas |
| | : | Court) |
| Appellee | : | |
| | : | |

. . . . . . . . . . .

O P I N I O N

Rendered on August 23, 2024

. . . . . . . . . . .

R. KELLY ORMSBY, III, Attorney for Appellant

ADAM J. ARNOLD, Attorney for Appellee

. . . . . . . . . . . .

EPLEY, P.J.

{¶ 1} The State appeals from a judgment of the Darke County Court of Common Pleas which suppressed evidence obtained during a traffic stop. Because a canine officer alerted to the presence of contraband in the vehicle and because a passenger in the vehicle who was also an informant gave officers information that the driver, Gabriella R.

Cantu, had just purchased drugs, law enforcement officers had probable cause to search the vehicle. The judgment of the trial court will be reversed, and the matter will be remanded for further proceedings.

## I.        Facts and Procedural History

{¶ 2} On March 31, 2023, Haly Moore contacted Sergeant Mason Wine of the Union City Police Department and disclosed that her friend, Cantu, wanted Moore to go with her to buy drugs. On April 1, Sgt. Wine and Moore met in person.   Moore explained that although she was friends with Cantu, she did not want to get in trouble for any drug deal that might happen. After further discussions, Moore agreed to share her cell phone location with Sgt. Wine, enabling him to track her whereabouts in real time.

{¶ 3} Using Moore's cell phone's GPS location and Flock Safety System cameras, Sgt. Wine tracked the Dodge Avenger that Cantu was driving to an address on Claydor Drive in Beavercreek. When the car stopped, Sgt. Wine sent Moore a simple text message: "How much?" She responded: "However much $440 is. IDK [I don't know] what shit past an 8ball is." Exhibit 1. Sgt. Wine understood that to mean Cantu had purchased $440 worth of drugs.

{¶ 4} After the purchase was made and Cantu and Moore were heading back to Union City, Sgt. Wine positioned other Union City officers around town to wait for the vehicle's return. Officer Detro (from Winchester, Indiana) and his canine partner were also put on stand-by.

{¶ 5} The pair arrived back in town, and officers noticed that "the vehicle [Cantu] was in had a plate that belonged to a Pontiac, and the vehicle she was in was a Dodge."

Suppression Tr. at 30. Sgt. Wine "believed it was a fictitious plate situation." Suppression Tr. at 32. After a quick stop at a Clark gas station, Cantu and Moore's car was pulled over by Officer Nicholas Baker around 11 p.m.

{¶ 6} Officer Baker approached the car on the driver's side and informed Cantu that "[t]here's an issue with your plate and I'm going to look into it." He collected identification from both women and returned to his cruiser to enter the information into the computer system. He returned to the car several times to get additional information from the women, including the car's title, as Cantu claimed that Moore had recently bought the car from her ex-boyfriend but had not yet completed the requisite paperwork. Officer Baker seemed to be suspicious of that explanation and noted that the title was "not signed by her [Moore] or anything. It's a blank title."

{¶ 7} Within two and a half minutes of initiating the stop, Officer Baker had summoned the canine officer, who quickly arrived on the scene. At the 11 minute and 30 second mark of Baker's body camera video, Baker is seen telling the canine officer to head to the car; a little over a minute later, the dog alerted to the driver's side door. Officers then ordered Cantu and Moore out of the Dodge Avenger and began to search the vehicle. A bong was found in the driver's side door, and Cantu later admitted to smoking meth with it.

{¶ 8} While some officers were searching the vehicle, Officer Baker patted down Cantu. Despite her insistence that she had nothing on her person, Officer Baker advised another officer on the scene that he suspected that Cantu was hiding contraband in or on her person because of the way she "clench[ed] her butt" during the pat down. That hunch

was given more credence when Moore told an officer that she saw Cantu stick something down her pants.

{¶ 9} Cantu was arrested for possession of the bong and was transported to the Darke County Jail. Despite being warned multiple times that bringing contraband into the jail would result in more serious charges, Cantu insisted that she did not have any drugs on her person until she was confronted in the jail's sally port by a female officer, who informed Cantu that a more thorough search would be done and reminded her again that a felony charge would result from the conveyance of drugs into the facility. A tearful Cantu finally admitted that she had secreted a package of drugs in her vagina. The package was retrieved, and Cantu was booked into jail. Lab testing determined that the package contained 69 grams of methamphetamine.

{¶ 10} Cantu was initially charged by criminal complaint with one count of aggravated possession of drugs (methamphetamine), a felony of the second degree. On April 27, 2023, she was indicted on the same charge. Cantu filed a motion to suppress evidence and, after months of delay, on November 13, the motion came before the trial court for a hearing. The State presented testimony from Sgt. Wine and Officer Baker and introduced two exhibits: text messages between Moore and Wine (Exhibit 1), and Baker's body camera videos from the scene and the Darke County Jail (Exhibit 2).

{¶ 11} On December 20, 2023, the trial court granted Cantu's motion to suppress, ordering that the evidence obtained by officers as a result of the traffic stop be excluded at trial. It reasoned that, according to Indiana law (the car was from Indiana), Moore had a grace period to correctly title the vehicle, and so when that was discovered, the reason

for the seizure had concluded, and Cantu and Moore should have been free to go. Accordingly, the free air sniff by the canine should not have happened. The court further held that there had not been probable cause to stop or search the car based on the purported purchase of drugs.

{¶ 12} The State appeals, raising a single assignment of error.

**II.     Suppression**

{¶ 13} In its assignment of error, the State argues that the trial court erred by granting Cantu's motion to suppress evidence.

{¶ 14} An appeal from a ruling on a motion to suppress presents a mixed question of facts and law. *State v. Ojezua*, 2016-Ohio-2659, ¶ 15 (2d Dist.). When considering a motion to suppress, the trial court takes on the role of trier of fact and is in the best position to resolve factual questions and assess the credibility of witnesses. *State v. Turner*, 2015-Ohio-4612, ¶ 10 (2d Dist.). As a result, we must accept the trial court's findings of fact if they are supported by competent and credible evidence. *Id.* "Accepting these facts as true, the appellate court must then independently determine, without deference to the conclusion of the trial court, whether the facts satisfy the applicable legal standard." *Id.*, quoting *State v. Koon*, 2015-Ohio-1326, ¶ 13 (2d Dist.). The trial court's application of law to the findings of fact is subject to a de novo standard of review. *Id.*

Seizure

{¶ 15} The outcome of this case depends upon the lawfulness of the search of the vehicle that Cantu was driving. But before we can analyze the search that gave rise to the evidence, we must first determine if the stop (the seizure) was valid.

{¶ 16} The Fourth Amendment of the United States Constitution and Article I, Section 14 of the Ohio Constitution protect individuals from unreasonable searches and seizures. *Terry v. Ohio*, 392 U.S. 1 (1968); *State v. Pressley*, 2012-Ohio-4083, ¶ 18 (2d Dist.).

{¶ 17} A traffic stop is a seizure within the meaning of the Fourth Amendment. *See Berkemer v. McCarty*, 468 U.S. 420, 436-37 (1984); *City of Dayton v. Erickson*, 76 Ohio St.3d 3 (1996). But an investigative stop of a motorist does not violate the Fourth Amendment if the officer has a reasonable suspicion of criminal activity. *Berkemer* at 439. "To justify a particular intrusion, the officer must demonstrate 'specific and articulable facts which, taken together with rational inferences from those facts, reasonably warrant that intrusion.' " *Maumee v. Weisner*, 87 Ohio St.3d 295, 299 (1995), citing *Terry* at 22. To evaluate, the court must consider the totality of the circumstances. *State v. Freeman*, 64 Ohio St.2d 291, 295 (1980).

{¶ 18} The State contends that officers had two reasons to stop the car. We begin with the reason that was given to Cantu: there was reasonable suspicion to believe that there were fictitious plates on the car.

{¶ 19} Upon initiating the stop of the Dodge Avenger driven by Cantu, Officer Baker explained to the women that there was an issue with the license plate and that he was going to investigate it. The problem, according to suppression hearing testimony, was that "the vehicle [Cantu] was in had a plate that belonged to a Pontiac, and the vehicle she was in was a Dodge." Suppression Tr. at 30. The officers, at both the stop and at the suppression hearing, described the violation as having "fictitious plates." While neither

officer cited a statute, they described a violation of R.C. 4549.08, Ohio's statute on the use of authorized plates. Based on that violation, we conclude that Officer Baker had a reasonable articulable suspicion that Cantu was committing a crime ("fictitious plates") and made a valid investigatory stop. *See State v. Cromes*, 2006-Ohio-6924, ¶ 29-30 (3d Dist.); *State v. Pringle*, 128 Ohio App.3d 740, 742 (11th Dist. 1998) (the fact that the license plate did not match the vehicle being driven by appellant provided an adequate basis to stop the vehicle).

**{¶ 20}** Having found there was a lawful reason to seize the car, we need not analyze the second reason the State gave for the stop – that officers had reasonable suspicion that illicit drugs were in the car. This topic will be discussed in detail in the next section.

Search

**{¶ 21}** It does not necessarily follow that just because a seizure (in this case, the stop of the Dodge) is lawful, officers automatically have the right to search the vehicle. In fact, warrantless searches are "per se unreasonable under the Fourth Amendment – subject only to a few established and well delineated exceptions." *State v. Hilton*, 2009-Ohio-5744, ¶ 21-22 (2d Dist.), citing *Xenia v. Wallace*, 37 Ohio St.3d 216, 218 (1988).

**{¶ 22}** The Supreme Court of Ohio has recognized seven exceptions to the warrant requirement, including two that are important to this case: exigent circumstances and the automobile exception. See *State v. Peck*, 2014-Ohio-2820, ¶ 8 (2d Dist.). "Exigent circumstances are a well-established exception to the Fourth Amendment's warrant requirement." *State v. Turner*, 2016-Ohio-7983, ¶ 18 (2d Dist.). The exigent-

circumstances exception "is founded on the premise that the existence of an emergency situation, demanding urgent police action, may excuse the failure to procure a search warrant." (Citation omitted.) *State v. Cheadle*, 2000 WL 966167, *2 (2d Dist. July 14, 2000).

{¶ 23} Under the automobile exception, police may conduct a warrantless search of a vehicle if there is probable cause to believe that the vehicle contains contraband, and exigent circumstances necessitate a search and seizure. *State v Mills*, 62 Ohio St.3d 357, 367 (1992); *Chambers v. Maroney*, 399 U.S. 42, 48 (1970). A vehicle's mobility is the exigency under this exception, and "[i]f a car is readily mobile and probable cause exists to believe it contains contraband, the Fourth Amendment . . . permits police to search the vehicle without more." *Pennsylvania v. Labron*, 518 U.S. 938, 940 (1996).

{¶ 24} Probable cause is a legal standard that refers to the reasonable belief, supported by specific and articulable facts, that a person has committed or is committing a crime. *State v. Martin*, 2022-Ohio-4175, ¶ 16-17. This means there must be more than "bare suspicion"; the circumstances must demonstrate a "fair probability" that a crime was committed. *Id.* at ¶ 18.

{¶ 25} In its brief (and at the suppression hearing), the State argues that officers lawfully searched the Dodge Avenger as they had probable cause to believe there were drugs in the vehicle. According to the record, Moore first met Sgt. Wine in early 2023 when he responded to the scene where her boyfriend had overdosed on drugs. They met again on March 15, 2023, when Moore's boyfriend relapsed. At that time, Sgt. Wine inquired about her willingness to be an informant, but she declined. On March 31, Moore

contacted Sgt. Wine to disclose that Cantu was going to "the city" to buy drugs and that Cantu had requested she ride along. During an in-person meeting on April 1, Sgt. Wine asked if Moore would be willing to be an informant, and after initially expressing concern because Cantu was her friend, Moore agreed to share her cell phone location with Sgt. Wine, enabling him to track their whereabouts in real time.

{¶ 26} Cantu and Moore travelled from Union City to Beavercreek on the evening of April 1, and Sgt. Wine followed their movements with the help of Moore's phone's GPS and Flock Safety System cameras which are positioned across the Miami Valley. The car stopped on Claydor Drive, prompting Sgt. Wine to text "How much?" Moore responded: "However much $440 is. IDK [I don't know] what shit past an 8ball is." Exhibit 1. Sgt. Wine testified that based on his conversations with Moore in which she stated Cantu was going to the city to buy drugs and the text exchange, he was sure Cantu had bought $440 worth of drugs. Suppression Tr. at 23-26, 60-61. He then relayed that information to other Union City police officers, including Officer Baker, who pulled Cantu over.

{¶ 27} The trial court found in its suppression decision, and Cantu argues now, that the information from Moore did not give rise to probable cause. The court focused on Sgt. Wine's suppression hearing testimony, noting that Wine did not witness "any criminal activity whatsoever," and the only suggestion of criminal activity was Moore's text.

{¶ 28} Although it is certainly true that Sgt. Wine did not see a drug deal happen in Beavercreek from his vantage point in Union City, it is hard for this Court to discount the text exchange with Moore and the context surrounding it. It is undisputed that Moore came to Sgt. Wine in the days before the incident with the knowledge that Cantu intended

to buy drugs and shared the information that Cantu wanted Moore to accompany her. Moore then sat in the passenger seat beside Cantu while traveling to Beavercreek and responded to Wine's inquiry about the amount of drugs purchased by stating, "However much $440 is. IDK what shit past an 8ball is." Based on the context and background, it is difficult to interpret the text in any way other than how Sgt. Wine did – that Cantu had just purchased $440 worth of drugs. That, we conclude, was probable cause to believe a crime had been committed and, thus, a search of the car was warranted.

{¶ 29} There was another event that night that gave officers probable cause to search the car: the canine free air sniff. It is well established that a drug dog sniff does not constitute a "search" under the Fourth Amendment. *State v. Jennings,* 2024-Ohio-602, ¶ 11 (2d Dist.). "If a trained canine alerts to the odor of drugs from a lawfully stopped and detained vehicle, an officer has probable cause to search the vehicle for contraband." *State v. Boyce*, 2020-Ohio-3573, ¶ 73 (2d Dist.).

{¶ 30} Officers do not have carte blanche to deploy the dog, however. "[A] police stop exceeding the time needed to handle the matter for which the stop was made violates the Constitution's shield against unreasonable seizures. A seizure justified only by a police-observed traffic violation, therefore, 'become[s] unlawful if it is prolonged beyond the time reasonably required to complete th[e] mission' of issuing a ticket for the violation." (Internal citations omitted.) *Rodriguez v. United States*, 575 U.S. 348, 349 (2015). *Rodriguez* made clear "that an officer may not prolong a traffic stop to perform a drug sniff even if the 'overall duration of the stop remains reasonable in relation to the duration of other stops involving similar circumstances.' " *Id.* at 357.

**{¶ 31}** Here, there is no indication that law enforcement prolonged the stop to allow for a free air sniff. According to Officer Baker's body camera video, within two minutes of initiating the stop, Officer Baker collected identification from Cantu and Moore and returned to his cruiser to enter their information into the system. At the 4:30 minute mark, while working in his cruiser, Officer Baker noted that the title he had been given "is not signed by her or anything. It's a blank title." At 5:30 minutes on the video, he returned to the car to inquire about insurance; while waiting for the insurance information, Officer Baker radioed the car's vehicle identification number to dispatch. At approximately the 6:30 mark, Moore informed Officer Baker that she did not have her insurance information; he returned to his cruiser and can be seen on the video actively inputting information into his on-board computer. A minute and a half later, at 8:00 into the video, Officer Baker returned again to the Dodge Avenger to get further information, including phone numbers. He also inquired of Moore about why she had not filled out the car's title because it was "practically blank." At approximately 9:30 minutes on the video, Officer Baker returned once more to his cruiser, and at 10:30 he can be seen interacting with dispatch and working on the computer. A minute later, after realizing that the canine officer had arrived, Officer Baker gave the okay to begin the free air sniff. At the 12:30 mark, the dog began, and by 12:38 it had alerted to the driver's side door where Cantu was seated.

**{¶ 32}** The record leads us to conclude that the duration of the stop was not extended beyond what was reasonably necessary to complete the traffic-related tasks. Based on the body camera video, Officer Baker worked diligently to investigate the license plate discrepancy and gain information on the women he had pulled over, and it

does not appear that Baker was purposely delaying to get the canine on the scene. Once the dog alerted, indicating the presence of illegal drugs, the officers had probable cause to search the vehicle.

{¶ 33} Both the information from Moore (that Cantu had bought drugs) and the canine alert gave Union City officers probable cause to search the car driven by Cantu. The State's assignment of error is sustained.

### III.    Conclusion

{¶ 34} The judgment of the trial court will be reversed, and the matter will be remanded for proceedings.

. . . . . . . . . . . .

WELBAUM, J. and HUFFMAN, J., concur.